CLERK
US DISTRICT & BANKRUPTCY
COURTS

2008 MAY 11  PM 7: 43

RECEIVED

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH JOHNSON, JR. | ) |
| Plaintiff, | ) |
| Vs. | ) Civil No. 07-02183 (JR) |
| U.S. DEPARTMENT OF EDUCATION, et al., | ) |
| Defendants. | ) |

### PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S
### MOTION FOR SUMMARY JUDGMENT AND OPPOSITION
### TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

The Plaintiff responds to the Defendant's Opposition to Plaintiff's Motion for

Summary Judgment and submits that Plaintiff's motion should be granted because

Plaintiff is entitled to summary judgment as a matter of law.

As explained in Plaintiff's motion, this case arises under the Higher Education

Act, 20 U.S.C. §1087(c), and the Administrative Procedure Act, 5 U.S.C. §706.  The

Plaintiff brought this action seeking declaratory and injunctive relief based upon the

Defendant's failure and refusal to perform her duty to discharge the Plaintiff's loans

under 20 U.S.C. §1087(c). Specifically, the Plaintiff is entitled to a "Disqualifying

Status" discharge because at the time of Plaintiff's enrollment at the school Plaintiff did

not have the "ability to benefit" from the Paralegal certification training because of his

existing criminal record.

# RECEIVED

MAY 1 1 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOSEPH JOHNSON, JR.                          )

     Plaintiff,                                )

Vs.                                          ) Civil No. 07-02183 (JR)

U.S. DEPARTMENT OF EDUCATION, et al.,        )

     Defendants.                               )

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S**
**MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**Introduction**

The resolution of the parties' summary judgment motions in this action turns on a single issue, namely whether the Plaintiff had the "ability to benefit" from the Paralegal certification training program offered by the school because of Plaintiff's criminal record at the time of his enrollment into the Paralegal certification training program.

**Legal Argument**

"It is a cardinal rule of administrative law that a reviewing court may not affirm an agency decision on the basis of a rational the agency did not itself adopt." Amerada Hess Pipeline Corp. v. FERC, 117 F.3d 596, 605 (D.C. Cir. 1997)(citing Securities and Exchange Comm'n v. Chenery, 318 U.S. 80, 87-88 (1942)). This rule is reflected in numerous decisions holding that, when a court reviews an agency decision, the decision must "stand or fall on the grounds articulated by the agency." Algonquin Gas Trans. Co. v. FERC, 948 F.2d 1305, 1312 n.12 (D.C. Cir. 1991); see, e.g., Puerto Rico Higher Educ. Ass't Corp. v. Riley, 10 F.3d 847, 850 (D.C. Cir. 1993)(court may not consider basis for

decision that the Department itself did not offer at the administrative stage); <u>Exportal LTDA v. Untied States</u>, 902 F.3d 45, 51 (D.C. Cir. 1990)(where agency order offers only one ground for decision, decision cannot be upheld based on alternative ground offered by counsel on review).

Here, the Defendant attempts to advance several theories why Plaintiff did not qualify for a loan discharge. First, the Defendant contends that it is not sufficient for Plaintiff to show that he is less likely to get a job, or at a disadvantage compared to other applicants, by reason of his record, but that instead, Plaintiff must show that he was unable to meet a job requirement by reason of his record. <u>See</u> Defendant's Opposition to Plaintiff's Brief at Page 7, ¶2.

And finally, the Defendant contends that "[t]he Secretary's conclusion that, in effect, Plaintiff's [paralegal] program was not specialized enough to support a "disqualifying status" discharge" was amply supported by the record. <u>See</u> Defendant's Opposition to Plaintiff's Brief at Page 9.

Because the Defendant did not rely on either of these theories as a basis for denying Plaintiff a discharge of his loans, Plaintiff submits that they would not be appropriate grounds for the Court to consider in this case.

Instead, the Defendant's final determination rested solely on the ground set forth in its September 6, 2007 determination stating that there were no records that indicated that Plaintiff was enrolled in a training program that specifically and exclusively prepared him for employment in law enforcement or "as a Paralegal", or because Plaintiff was not

3

enrolled in law school.[1] See Plaintiff's Brief at Exhibits 10-14 and Plaintiff's Statement of Material Facts Not In Dispute, at ¶¶12-13.

Thus, Plaintiff submits that this case "stand or fall" on the ground articulated in the Defendant's September 6, 2007 determination on whether the record indicate that Plaintiff was enrolled in a training program that specifically and exclusively prepared him for employment "as a Paralegal". See Plaintiff's Brief at Exhibits 10-14.

As stated in Plaintiff's brief and sworn affidavit, the Plaintiff was enrolled at the UMUC as an undergraduate seeking a certification in the school's Paralegal training program that specifically intended to prepare Plaintiff for employment as a Paralegal and, the Defendant has not offered any evidence that dispute that fact. See Plaintiff's Statement of Material Facts Not In Dispute at ¶2 and Affidavit of Plaintiff in Support of Motion for Summary Judgment at ¶Paragraph 2.

Thus, Plaintiff is entitled to summary judgment in this case because the Defendant's denial of Plaintiff's loan discharge was arbitrary, capricious and an abuse of her authority and was done out of accordance with law.

## A.    DEFENDANT ATTEMPTS TO IMPOSE CONDITIONS THAT GO BEYOND THE CONDITIONS SET FORTH BY CONGRESS IN THE STATUTE AND MAY NOT IMPOSE SUCHCONDITIONS

Plaintiff argued in his brief that the Defendant improperly concluded that Plaintiff was required to inform the school of his status prior to enrollment and provide documentation proving that he was denied a license due to a criminal record. See Plaintiff's Brief at Page 14.

---

[1] Indeed, the Defendant has specifically stated, that "the Department repudiated the reasoning of the initial decision". The final agency's determination was rendered on September 6, 2007. See Defendant's Opposition to Plaintiff's Brief at Page 11.

The Defendant now concedes that it repudiated those reasoning. Instead, the Defendant attempts to argue that had the Plaintiff ever shown that his [paralegal] program prepared him exclusively for an occupation in which "licensure was required", and that under Maryland law Plaintiff's criminal record would have precluded him from obtaining such a license, the discharge would have been granted. See Defendant's Opposition to Plaintiff's Brief at Page 11, Paragraph 3.

As stated in Plaintiff's initial brief, an agency's authority to issue regulations and implement statutes does not permit the agency to impose conditions that go beyond the conditions set forth by Congress in a statute and add, by regulation "something that is not there." United States v. Calamaro, 354 U.S. 351, 359 (1957). In particular, recent decisions of the Court of Appeals have emphasized that the deference accorded to agencies under Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984), does not apply when an agency seeks to impose conditions or consider factors that are not authorized by the express language of the statue. See National Mining Ass'n, 105 F.3d at 693; Ethyl Corp. v. EPA, 51 F.3d at 1063-64.

Under these precedents, the subsequent requirement that a student show that his program prepared him exclusively for an occupation in which "licensure" was required cannot be upheld unless it somehow can be shoehorned into the language of 20 U.S. §1087(c) as a valid interpretation of the statutory language of false certification.

Both the regulations and statutory language show that it cannot because the subsequent requirement that a student show that his program prepared him exclusively for an occupation in which "licensure" was required imposes a separate condition not found in the statute.

1.  **Regulatory Language**. It is well settled that an agency interpretation of a statute "merely" 'declare[s] its understanding of what a statute requires,' "and may not impose new requirements that go "beyond the text of the statue."" American Mining Congress v. Mine Safety & Health Admin., 995 F.2d 1106, 1110 (D.C. Cir. 1993)(quoting Fertilizer Inst. v. United States Environmental Protection Agency, 935 F.2d 1303, 1308 (1991). The text of the Secretary's regulations themselves demonstrate that the subsequent requirement that a student show that his program prepared him exclusively for an occupation in which "licensure" was required does not "merely declare" the meaning of "false certification," but creates new, separate requirements on its own.

There is no language in 20 U.S.C. §1087(c) that authorizes the Defendant to impose the additional requirements that requires a student show that his program prepared him exclusively for an occupation in which "licensure" was required. This requirement imposes a separate condition not found anywhere in the statute.

In Jordan v. Secretary of Education, 338 U.S. App. D.C. 379; 194 F.3d 169; 1999 U.S. App. LEXIS 29849 (1999), the United States Court of Appeals for the DC Circuit held that the statutory scheme was designed to place obligations on schools, which must certify ability, and on government, which must police schools to ensure that their certifications are accurate, or failing that must compensate defrauded students.

Thus, the Defendant may not impose a condition that requires that a student show that his program prepared him exclusively for an occupation in which "licensure" was required. The Defendant's attempt to employ a separate and additional requirement that a student show that his program prepared him exclusively for an occupation in which

"licensure" was required is underscored by the fact that if a borrower "was admitted to that school on the basis of ability to benefit" without meeting the applicable requirements, 34 C.F.R. §682.402(e)(3)(ii)(B), and withdrew from the school, as did the Plaintiff, the borrower does not need to show that he or she ever sought employment in the program for which the program was intended to provide training" in order to receive a discharge. Id. 682.402(e)(3)(ii)(C).

Thus, the Defendant's additional requirement on limiting discharge to only occupations requiring a "license" foreclose meritorious claims for discharge in ways that are neither logical nor fair. More importantly, the Defendant's requirements would be unlawful because Congress established the test for discharges, and did not require applicants to meet <u>any</u> conditions concerning subsequent employment, such as the denial of a license or showing that the occupation requires a "license".

Agencies are not entitled to "deference" under <u>Chevron</u> or other doctrines when their regulations are not limited to the terms of the statute, but seek to impose additional conditions beyond those authorized by Congress. <u>National Mining Ass'n</u>, 105 F.3d at 693, 694-95.

Moreover, the Court of Appeals has made clear that an agency's general rulemaking authority cannot be used "to trump Congress's specific statutory directive,"<u>Id</u>. at 694, or be used "as justification for adding new factors to a list of statutorily specified ones." <u>American Petroleum Inst. v. United States EPA</u>, 52 F.3d 1113, 1119 (D.C. Cir. 1995). These cases demonstrate that the conditions for discharge that the Defendant attempts to add to Congress' statutory language are not entitled to any

7

deference because the Defendant cannot impose conditions that are not authorized by Congress. Bowen v. Georgetown Univ. Hosp., 448 US. 204, 208 (1988).

Turning to the facts of this case, in order to be eligible to receive the proceeds of a guaranteed student loan, an institution, such as the UMUC must, among other requirements, admit as regular students only persons who have the "ability to benefit" from the training offered by the institution. 20 U.S.C. §1085(c); 34 C.F.R. §600.7(a) (1988).

Here, the Defendant contends that the "ability to benefit" provisions of the statute and regulations did not require the University of Maryland to determine whether the Plaintiff had a record, either before or after certifying him as eligible for such a loan and that those provisions instead "simply" require institutions to use prescribed methods to assess the educational capacity of prospective students who lack high school diplomas, and provide for discharge of loans if the institution fails to conduct the requisite assessment. See Defendant's Opposition to Plaintiff's Brief at Page 6.

The Defendant apparently overlooks the fact that in its own regulations it expressly states that a student did not have the "*ability to benefit*" from the training offered by the school *if the school certified* the eligibility of the student for a FFEL Program loan; and at the time of certification, the student would not meet the requirements for employment in the occupation for which the training program supported by the loan *was intended* because of a physical or mental condition, age, or criminal record or other reason accepted by the Secretary. (emphasis added). 34 C.F.R. §682.402(e) (13) (iii) (A) (B).

8

As Plaintiff stated in his brief, based upon Maryland's Employment law and
Public Policy, the Plaintiff did not, as a matter of law, have the "ability to benefit" from
the Paralegal certification training program offered by UMUC because of Plaintiff's
criminal record.

As the Defendant well knows, under federal law, a background investigation is a
job requirement under 5 C.F.R. §731 or §732 and is necessary to determine an applicant's
suitability and fitness for employment and, a felony "criminal record" or dishonest
conduct are among a few factors that are considered as a basis for finding an individual,
like the Plaintiff, unsuitable for federal employment. Id.

Moreover, the State of Maryland has a Public Policy toward ex-offenders.
Although ex-offenders are specifically excluded by law in only a few occupational
arenas, the law raises a red flag for employers in a host of other occupational areas,
requiring or encouraging them to conduct criminal background checks. Thus, combined
with the judicial doctrine that makes employers liable for the foreseeable harm an
employee causes to others, these background check laws often operate as a bar to hiring.
See *Ex-Offenders and Employment, A review of Maryland's Public Policy*; at Pages (v)
and Pages 1-14; Annexed hereto as Attachment A.

## CONCLUSION

Plaintiff did not benefit from the Paralegal certification training program for
which he was falsely certified and has suffered "real injury" by being saddled with a loan
debt, but the Secretary attempts to preclude Plaintiff from receiving the discharge of this
loan mandated by the statute. As stated above and in Plaintiff's dispositive motion, the
Defendant expressly acknowledged that "[t]he Higher Education Act of 1965, as

9

amended (HEA), establishes discharge requirements under the circumstances Plaintiff described in his loan discharge application" but specifically denied Plaintiff's request for discharge on the basis that there were no records that indicated that Plaintiff was enrolled in a training program that specifically and exclusively prepared Plaintiff for employment in law enforcement or "as a Paralegal", and because Plaintiff was not enrolled in law school.

Despite the fact that on September 10, 2007, Plaintiff provided the specific documentation to the Defendant that unequivocally indicated that he was enrolled in the UMUC Paralegal certification training program that intended to prepare him for employment as a professional paralegal, on September 25, 2007, the Defendant affirmed its decision of September 6, 2007.

The Secretary's denial of Plaintiff's loan discharge, even after Plaintiff provided the specific documentation that unequivocally indicated that he was enrolled in the UMUC Paralegal certification training program, was arbitrary, capricious and an abuse of her authority and was done out of accordance with law.

For the reasons set forth herein and in Plaintiff's dispositive motion, it is respectfully requested that the Court deny the Defendant's motion for summary judgment and grant Plaintiff's motion by entering a declaratory judgment that (i) the Defendant's regulations imposing conditions that requires a student inform the school of his status prior to enrollment or provide documentation proving the denial for a license due to a criminal record or show that his program prepared him exclusively for an occupation in which "licensure" was required in order to qualify for discharge under Section 1087(c) are unlawful and void because they are not authorized by the statute; and (ii) the

Defendant is obligated to discharge the liability on the loan of the Plaintiff in accordance with 20 U.S.C. §1087(c).

Respectfully submitted,

May 11, 2008

_Joseph Johnson, Jr._
Joseph Johnson, Jr.
2600 Brinkley Road, #1005
Fort Washington, MD   20744

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2008, I caused copies of Plaintiff's Reply in Support of Plaintiff's Motion for Summary Judgment and Opposition to Defendant's Motion for Summary Judgment and Plaintiff's Reply to Defendant's Opposition to Plaintiff's Statement of Material Facts Not In Dispute, were mailed to:

Claire Whitaker
Assistant United States Attorney
United States Attorneys Office
Civil Division
555 4th Street, N.W., Room E-4204
Washington, DC   20530

by regular, first-class mail, postage prepaid.

_Joseph Johnson, Jr._
Joseph Johnson, Jr.

**UNITED STATES DISTRICT COURT**
**FORTHE DISTRICT OF COLUMBIA**

| | |
|---|---|
| JOSEPH JOHNSON, JR. | ) |
| Plaintiff, | ) |
| Vs. | ) Civil No. 07-02183 (JR) |
| U.S. DEPARTMENT OF EDUCATION, et al., | ) |
| Defendants. | ) |

### PLAINTIFF'S REPLY TO DEFENDANT'S OPPOITION TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.    Not disputed.

2.    Plaintiff's reference to his program as a "Paralegal certification training program" or as a "professional paralegal program" is consistent with record and Plaintiff's sworn affidavit. The Defendant does not offer anything that contradicts the Plaintiff's characterization of the Paralegal certification training program. The purpose the Plaintiff attended UMUC was to obtain a certificate in and become a certified Paralegal. Plaintiff further states that he relies on the facts contained within Paragraph 2 and those articulated in the Plaintiff's sworn affidavit.

3.    Not disputed.

4.    Not disputed.

5.    Not disputed.

6.    See Paragraph 2, above, regarding the use of the term "paralegal certification training program." Further, plaintiff states that pursuant to 34 C.F.R. §682.402(e) (13) (iii) (A) (B), he <u>did not</u> have the "***ability to benefi***t" from the training offered by the school because *the school certified* the eligibility of the Plaintiff for a

14

FFEL Program loan; and at the time of certification, Plaintiff could not meet the
requirements for employment as a Paralegal for which the training program supported by
the loan *was intended* because of Plaintiff's criminal record. (Emphasis added). The
Plaintiff met the requirements for a discharge of the loans. Defendant believes however
that this factual statement is not material to the resolution of this case, which Plaintiff
believes it is. Plaintiff further states that he relies on the facts contained within Paragraph
6 and those articulated in the Plaintiff's sworn affidavit.

　　　　7.　　　　See Paragraphs 2 and 6. Plaintiff further states that he relies on the facts
contained within Paragraph 7 and those articulated in the Plaintiff's sworn affidavit.

　　　　8.　　　　Not disputed.

　　　　9.　　　　See Paragraph 6, above. Plaintiff states that he did not submit multiple
requests for false certification discharge of his student loans. Instead, those submissions
were an initial submission followed by reconsideration submissions and a final agency
determination. Indeed, these were the preferred method by which the Plaintiff had
knowledge of seeking a full consideration of his false certification discharge of his
student loans, because as the Defendant candidly admitted in its Answer to Plaintiff's
Complaint, the Defendant denies that an appeal mechanism exists. See Defendant's
Answer filed February 22, 2008, at ¶26. Further, the May 7, 2007 document attached as
Exhibit as 9 to PSMF reflected a reconsideration of Plaintiff's initial submission for a
false certification discharge of Plaintiff's student loans and is referred to as
reconsideration documentations by the final agency decisions dated September 6, 2007.

　　　　10.　　　　See Paragraph 6, above. With regard to PSMF Paragraph 10 and Exhibit 8
reflects a request for reconsideration and does not reflect a new application for discharge,

dated May 15, 2007 and is referred to as such by the final agency decision dated
September 6, 2007.

11.     With regard to PSMF 11, PSMF Exhibit 9 was a "denial" by the
Defendant of Plaintiff's May 15, 2007 appeal. It was not an initial processing of a
discharge application Plaintiff filed on May 15, 2007.

12.     The statements contained in Exhibit 12 speak for themselves.

13.     See Paragraph 2 and 12, above.

14.     Not disputed and material

15.     Not disputed and material.

16.     Not disputed and material.

17.     Not disputed and material.

Respectfully submitted,

May 11, 2008

Joseph Johnson, Jr.
2600 Brinkley Road, #1005
Fort Washington, MD   20744

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing was served by First-Class mail,

postage prepaid on:

> Claire Whitaker
> Assistant United States Attorney
> United States Attorneys Office
> Civil Division
> 555 4th Street, N.W., Room E-4204
> Washington, DC   20530

on this 11th day of May 2008.

Joseph Johnson, Jr.

# Ex-Offenders And Employment
## A REVIEW OF MARYLAND'S PUBLIC POLICY AND A LOOK AT OTHER STATES

**PREPARED BY**
the
**HOMELESS PERSONS REPRESENTATION PROJECT**

300 CATHEDRAL STREET • SUITE 204
BALTIMORE, MARYLAND 21201
(410) 685-6589 • TOLL FREE (800) 773-4340
FAX (410) 625-0361

*Through the Support Of The Abell Foundation*

December, 2001
Revised & Updated, June 2002

# TABLE OF CONTENTS

EXECUTIVE SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. MARYLAND'S PUBLIC POLICY TOWARD EX-OFFENDERS . . . . . . . . . . . . . 2
    A. Arrests vs. Convictions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    B. Statutory Bars to Employment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        1. School Employees: Persons Convicted of Sexual Crimes or Crimes Of Violence
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        2. Respite Care or Personal Care Attendants: Persons Convicted of A
           Felony or Any Crime Involving Moral Turpitude or Theft . . . . . . . 3
        3. Dependent Care Providers: Persons With Criminal Histories Indicating
           Potentially Harmful Behavior . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        4. Correctional Officers: Persons With Felony and Misdemeanor Convictions
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    C. Statutorily Required Background Checks . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
        1. Facilities and Individuals That Care For Or Supervise Children . . . . . . 4
        2. Health Care Facilities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        3. Taxicab Drivers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
        4. Drivers for Government or Non-Profits . . . . . . . . . . . . . . . . . . . . . . . 5
        5. Department of Juvenile Justice Personnel . . . . . . . . . . . . . . . . . . . . . 6
        6. License for Security Systems Technicians . . . . . . . . . . . . . . . . . . . . . 6
    D. Statutorily Suggested Background Checks . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        1. County Employees (Howard, Anne Arundel, and Carroll) . . . . . . . . . 6
        2. Fire Department/Rescue Squad Personnel . . . . . . . . . . . . . . . . . . . . . 6
        3. License for Pharmacists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        4. License for Heating, Ventilation, Air Conditioning, and Refrigeration Contractors
            . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        5. License for Engineers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        6. All Licenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    E. The Negligent Hiring Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
    F. Expungements, Pardons and Probations Before Judgement . . . . . . . . . . . . . 9
        1. Expungements . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        2. Pardons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
        3. Probation Before Judgement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
    G. Consumer Reporting Agencies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
        1. The Prohibition on Reporting on Criminal Records Older Than Seven
           Years . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

2. Notice of Report to Applicant ............................ 12
3. Notice of Rejection to Applicant Based Upon Report ............ 12
4. Remedies Under Reporting Agency Violations .................. 13
H. Other Civil Disabilities .................................... 13
1. Voting ........................................... 13
2. Public Housing And Section 8 ........................... 14
3. Public Benefits ..................................... 14
I. Conclusion .......................................... 15

III. NEW YORK ........................................... 16
A. The Statute ......................................... 16
1. History ........................................... 16
2. The Eight Factor Test ................................. 17
3. Certificates of Rehabilitation ........................... 18
4. Notice Provisions ................................... 19
5. Enforcement ...................................... 19
B. Objective Evaluation ................................... 20
1. Ex-Offender Claims Compared to Total New Hires    ........ 21
2. Disposition of Ex-Offender Claims ....................... 22
3. Ex-Offender Claims Compared to the Total of Ex-Offenders ....... 23
C. Subjective Evaluation .................................. 23
1. Broad-Based Hiring Prohibitions ......................... 23
2. Certificates of Rehabilitation
.................................................. 24
3. Enforcement of the 8 Factor Test ........................ 24
4. Overhauling the System
.................................................. 25
D. Conclusion ......................................... 26

IV. WISCONSIN .......................................... 28
A. The Statute ......................................... 28
B. Enforcement ........................................ 28
C. Interpretation of "Substantial Relationship" .................. 29
D. Attempts to Narrow Scope of Statute ....................... 30
E. Objective Evaluation ................................... 31
F. Subjective Evaluation .................................. 32

V. PENNSYLVANIA ........................................ 34
A. The Statute ......................................... 34
B. Enforcement ........................................ 34

C. Backlash . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
D. Objective and Subjective Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

VI. MASSACHUSETTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
A. The Statutes
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
B. The Expansion of CORI Access . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
C. Objective and Subjective Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

VII. OTHER STATES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
A. Hawaii: Discrimination Outlawed Unless Rationally Related to Job . . . . . . 40
B. Minnesota: Discrimination in Public Employment Outlawed Unless
    Directly Related to Job . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
C. Washington: Discrimination in Public Employment Outlawed Unless
    Directly Related to Employment; Certain Convictions Can Be Vacated
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
D. Colorado: Certain Convictions Can Be Sealed . . . . . . . . . . . . . . . . . . . . . 41
E. New Jersey and Louisiana: Occupational Licensing Protection . . . . . . . . . . 41

VIII. CONCLUSION AND RECOMMENDATIONS . . . . . . . . . . . . . . . . . . . . . . . 42
1. Prohibit the Reporting and Consideration of Non-Convictions . . . . . . . . . . 42
2. Prohibit the Consideration of Any Conviction Older Than Seven
    Years and Misdemeanor Convictions Older Than Five Years . . . . . . . . 43
3. Require Employers To Give Written Notice of Denials of Employment
    To Ex-Offenders That Provide the Reasons for the Denial . . . . . . . . . . 43
4. Outlaw Broad Based Hiring Prohibitions and Require Employers To Consider
    Certain Factors When Evaluating Ex-Offenders . . . . . . . . . . . . . . . . . . . . 44
5. Provide Both an Administrative and Judicial Forum for Enforcement of the
    Factor Test That Will Be Utilized By Aggrieved Claimants . . . . . . . . . . 45
6. Limit Employer Liability Under the Negligent Hiring Doctrine . . . . . . . . . . 45
7. Amend the Expungement Statute To Allow Expungement of All
    Non-Convictions, Regardless of Subsequent Behavior by the Defendant
    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

## EXECUTIVE SUMMARY

This analysis examines the role of state public policy in the employment of ex-offenders, and attempts to evaluate the efficacy of various approaches to date by different states. It is written for policy makers, employers, ex-offenders, and others who are interested in crafting Maryland public policies that balance the twin concerns of ex-offender rehabilitation and recidivism.

To date in Maryland, there has been no balance. Twenty-six state laws either prohibit the employment of ex-offenders or require employers to conduct criminal background checks. The statutory bars to employment involve

- those convicted of crimes relating to sex or violence– barred from school employment;
- those convicted of a felony or any crime involving moral turpitude or theft–barred from Respite Care or Personal Care attendant jobs;
- those with criminal histories indicating behavior that is potentially harmful– barred from employment in the Dependent Care industry.

Background checks are statutorily required for

- facilities that care for or supervise children;
- Health Care facilities;
- Taxicab drivers and drivers for government or non-profit agencies;
- Department of Juvenile Justice Personnel; and
- security systems technicians.

Background checks are statutorily suggested for a host of employment licenses, for public jobs in Howard, Anne Arundel and Carroll counties, and for employment with Fire Departments and Rescue Squads.

When combined with the "Negligent Hiring Doctrine," a judicially constructed basis for employer liability when employees commit foreseeable harm to third parties, these statutorily required or suggested background checks effectively operate as bars to employment for those with criminal histories.

Despite popular belief otherwise, criminal histories include more than just convictions. All arrests and charges, regardless of their disposition, can be accessed by employers primarily through consumer reporting agencies. These agencies, now easily accessible through the Internet, are prohibited by Maryland law from reporting, for many jobs, charges and convictions that are older than seven years. Many reporting agencies, however, flout the law and provide complete criminal histories to employers, citing recent federal amendments that appear to conflict with state law to support their action.

The only tools provided to ex-offenders in Maryland, expungements, pardons, and

v

probations before judgement, have limited impact. Pardons are difficult to obtain, expungement is available for non-convictions *only if the defendant has avoided any subsequent conviction,* and probations before judgement, a court disposition that is intended to sidestep the civil disabilities of conviction, are viewed by most employers as evidence of conviction and thus do little to aid ex-offenders unless expunged.

In addition to these employment obstacles, *any criminal activity,* regardless of its disposition, can bar a person from publicly subsidized housing. Those convicted of two felonies are barred from voting, and those convicted of drug related felonies after August, 1996 cannot receive Food Stamps, Temporary Cash Assistance, or Emergency Assistance, although custodial parents can obtain these benefits under certain conditions.

In short, despite the clear public interest in the employment and integration of ex-offenders into the community, this interest is conspicuously absent from Maryland's public policy, which is governed solely by public safety concerns. Other states, however, have attempted to strike a balance in this area.

**New York**

Since 1976, New York has provided ex-offenders with a number of statutory tools to overcome discrimination. Employers are prohibited from simply rejecting ex-offenders outright and are required to examine eight factors before making a hiring decision, including the age of the ex-offender at the time of the offense, the seriousness of the offense, the relationship of the offense to the job sought, and any information relative to rehabilitation. Additionally, certain ex-offenders are eligible to obtain state-issued "Certificates of Rehabilitation" that create presumptions of rehabilitation and remove any legal bars to employment. Ex-offenders who believe employers have not considered the eight factors or given proper weight to a certificate can seek enforcement of the law through the state civil rights agency or through litigation.

Though complaints of discrimination are rampant, few ex-offenders formally file claims or seek certificates of rehabilitation. Despite state correctional institution discharges of roughly 25,000 persons annually, an average of 113 ex-offenders file discrimination complaints each year while only 300 annually seek certificates. The ex-offender discrimination complaints average less than 2% of all employment discrimination claims filed in New York, and make up less than 1% of all new hire transactions in the state. Claimants prevail in roughly one-third of the cases filed. Needless to say, the law has had little adverse impact on state economic development.

Some of those who work with ex-offenders believe employers are savvy to the system and have developed ways to circumvent it. Others believe that the law enforcement process is slow, and ex-offenders in need of immediate income prefer to expend their energy looking for work. One organization has pushed state legislation to "seal" the criminal record of non-violent offenders who show evidence of rehabilitation.

New York's system is ambitious and provides ex-offenders with a variety of tools to overcome discrimination in the marketplace. Clearly, the tools are underutilized and employers have learned to circumvent the statutory limitations placed upon them. Any state looking to build a new entryway to the labor market for ex-offenders, should, however, examine New York's multi-faceted approach and its 25 year experience closely. The recent push to seal some records, rather than police employer behavior, is instructive.

Additionally, it is possible that a more user-friendly enforcement mechanism, including the provision of attorney's fee recoupment, would embolden complainants.

### Wisconsin

Like New York, Wisconsin requires employers to examine the relationship between the criminal history of an ex-offender and the nature of the employment sought. Employers are allowed to consider criminal histories only to the extent they bear a "substantial relationship" to the job. During the initial ten years of the law, the administrative agency responsible for its enforcement developed a list of factors, similar to those used in New York, that an employer had to consider when evaluating ex-offenders. In 1987, however, the state's highest court effectively struck down this factor test and allowed employers to make sweeping generalizations about the character of ex-offenders based simply on the nature of the offense committed. Evidence relating to the circumstances of the offense or to rehabilitation was deemed irrelevant. A review of cases since 1987 indicates now that "any relationship" an employer can show between a criminal history of an applicant and the duties of employment will support rejection of the applicant.

As with New York, few ex-offenders in Wisconsin avail themselves of the law's enforcement mechanism. In FY 2001, 212 persons filed complaints relative to alleged discrimination on the basis of conviction records, while 130 filed complaints based on arrest records. Yet, Wisconsin paroled 5,918 inmates from correctional facilities in 2000 and placed an additional 25,291 on probation. Of the complaints filed, anywhere from one-quarter to one-third prevail.

Ironically, success for discrimination claimants in a few high profile cases has created a legislative push to limit Wisconsin's already watered-down protections. Under the proposals, school and other employers would be allowed to discriminate against felons.

Wisconsin's approach demonstrates the pitfalls of a general discrimination prohibition that is left to the courts for interpretation.

### Pennsylvania

Pennsylvania represents a half-hearted attempt to provide anti-discrimination protection to ex-offenders. While the state statute prohibits discrimination, employers can overcome the prohibition by showing simply that the criminal history "relates" to the employment sought. More importantly, Pennsylvania's law provides no remedy for aggrieved claimants, nor creates

vii

an administrative enforcement mechanism as provided in New York and Wisconsin. Ex-offenders in Pennsylvania must litigate to enforce the law–an option made even more difficult without the statutory authority to recoup attorneys fees. Needless to say, few cases are brought under the law.

Pennsylvania also has experienced a Wisconsin-like backlash against the employment of ex-offenders. In 1996, state legislators prohibited the employment in health care facilities of any individual convicted of a crime involving sex or violence. Additionally, a ten-year bar to health care employment was placed upon those convicted of other felonies and certain misdemeanors. The law is being challenged in court.

## Massachusetts

Instead of seeking to control employer behavior, Massachusetts chose instead to limit the information available to employers. Any request for an individual's criminal history must be submitted to a state-run board that meets monthly to evaluate the petitions. The Board balances the needs of the employer with the privacy interests of the potential employee. Prompted by a number of high profile cases of recidivism, the Board has been forced to expand access to criminal histories. Employers can now obtain a special certification of approval, eliminating the need to submit individual criminal history queries. Legislation also has created a public right to obtain any information on "active criminals," those persons under parole or probation. Access remains for two years subsequent to completion of the sentence for felony offenders, while a one year window exists for misdemeanor offenders.

Despite the increased rights of access, it appears that only 5% of all employers in the state have secured special (or blanket) certifications of access to criminal histories. The Massachusetts approach clearly is the most effective means of eliminating employment discrimination. Yet, it has its risks.

In 1996, Massachusetts implemented the harshest public policy crackdown on ex-offenders, prompted, as in Wisconsin and Pennsylvania, by media reports. Then Governor William Weld instituted a ban on employment of ex-offenders in the human services arena that extended to any agency receiving state money. The bar created three groups of ex-offenders subject either to a lifetime, ten year, or five year employment bar depending on the nature of the offense. The policy was modified by Weld's successor to allow persons subject to the ten and five year bars to overcome the limitation by showing rehabilitation. The lifetime bar was struck down by the state's high court recently.

## Other States

- •• Hawaii outlaws discrimination unless rationally related to the job, and prohibits employers from considering convictions that are older than ten years;
- •• Minnesota outlaws discrimination in public employment unless directly related to the job.

- •• Washington outlaws discrimination in public employment unless directly related to the job, and allows certain convictions to be "vacated."
- •• Colorado allows certain convictions to be "sealed."
- •• Louisiana and New Jersey provide occupational licensing protection.

## Conclusion and Recommendations

No state has successfully balanced the twin policy concerns of recidivism and rehabilitation relative to ex-offenders in the employment realm. Their failures are no excuse for legislative silence in Maryland. No Maryland law explicitly acknowledges the public interest in employing ex-offenders and requires employers to consider it. This recognition and policy is long overdue.

Maryland's public policy should

- •• Prohibit the reporting and consideration of any non-convictions;
- •• Prohibit the consideration of any conviction older than seven years and misdemeanor convictions older than five years;
- •• Require employers to give written denials of employment to ex-offenders that provide the reasons for denial;
- •• Outlaw broad based hiring prohibitions and require employers to consider certain factors when evaluating ex-offenders;
- •• Provide both an administrative and judicial forum for enforcement of the factor test, and notify ex-offenders of these forums whenever criminal background inquiries are made by employers;
- •• Limit employer liability under the Negligent Hiring Doctrine;
- •• Amend the expungement statute to allow expungement of all non-convictions, regardless of the subsequent behavior of the defendant.

Additionally, Maryland should provide state funds to support the Federal Bonding program, which provides employers with Fidelity bonds that insure employers from employee dishonesty or theft. Maryland also should extend, with some modification, many of the above policies to the housing, public assistance, and voting arenas, to evince a consistent public policy and to rectify the imbalance that currently exists.

ix

# I. INTRODUCTION

In theory, an employer's decision to hire is a rather simple equation that compares the marginal benefit of the additional employee to the marginal cost. In hiring ex-offenders, this cost assessment also will include the risk of harm to the employer's property, employees, or customers because of the possibility of ex-offender recidivism.

Employers in Maryland, as elsewhere, have adopted various means to assess this cost. Some rely on organizations that work with ex-offenders and the direct evidence they provide about efforts at rehabilitation and stability. Others undertake this "screening" themselves, segregating and excluding some ex-offenders by reliance on hiring rules assumed to be sound predictors of future behavior. Still others avoid the cost altogether, excluding all ex-offenders, regardless of the offense.

Through it all in Maryland, this cost-benefit analysis is treated by law as essentially a private matter solely between the employer and potential employee. While there is a compelling public interest in the employment of ex-offenders and the decrease in recidivism it brings, no employer in Maryland is required by law to alter its cost-benefit equation to consider it.

Many other states, however, require employers and occupational licensing authorities to consider this public interest in their hiring equations. Twelve states (California, Connecticut, Florida, Hawaii, Kentucky, Maine, Minnesota, New Mexico, New York, Pennsylvania, Washington and Wisconsin) place public employers under a general duty *not to discriminate* against ex-offenders, but allow them flexibility in cases where offenders' crimes bear a "substantial" or "direct" relationship to the specific employment sought.[1] At least four of these states (New York, Wisconsin, Pennsylvania, Hawaii) extend this general duty of non-discrimination to private employers as well. Other states, like Massachusetts, limit the information available to employers. In the occupational licensing arena, 25 states limit the ability of licensing agencies to discriminate against ex-offenders, allowing license denials only where a nexus exists between past crimes and the license sought.

The efficacy of these laws is largely a matter of perspective. Certainly, the mere existence of a law– even a well-enforced one– does not guarantee a change of behavior. Yet, few would argue against civil rights laws outlawing race, gender, religious, or disability based discrimination because of the myriad practices employers have adopted to avoid them. A law is not simply a limitation on behavior, but a legislative articulation of our values and the standards by which we measure ourselves.

The pages that follow examine the experience of a number of states that have expressed policy aspirations relative to the rehabilitation of ex-offenders. While attempts were made to assess through objective means the efficacy of these efforts, the conclusions drawn are largely subjective. Likewise, the decision to advocate for and pass legislation requiring Maryland employers to consider the public interest in hiring ex-offenders is essentially a political one, based on costs and benefits that cannot be accurately assessed. In the end, the question is a

1

simple one: Do our laws express the hopes we have for ex-offenders and maximize the opportunities for their realization? To answer this, we must look first at Maryland's current expressions of policy in this arena.

## II. MARYLAND'S PUBLIC POLICY TOWARD EX-OFFENDERS

To date, the expressions of public policy manifested in Maryland law relative to ex-offenders and employment sound a single theme: beware. While ex-offenders are specifically excluded by law in only a few occupational arenas, the law raises a red flag for employers in a host of other occupational areas, requiring or encouraging them to conduct criminal background checks. Combined with the judicial doctrine that makes employers liable for the foreseeable harm an employee causes to others, these background check laws often operate as a bar to hiring. The few tools provided by policy to ex-offenders, such as expungement of non-convictions and pardons, are of limited practical value, as are the restrictions placed on consumer reporting agencies that supply criminal history information. Noticeably absent in Maryland's statutory scheme is the recognition of the public interest in the employment of ex-offenders.

### A. Arrests vs. Convictions

The bedrock of our criminal justice system is the presumption of innocence. This presumption is overcome only by a finding of guilt, a conviction. Many arrests do not result in convictions (See Text Box) and can be the result of charges that are, in fact, spurious or specious. (The Homeless Persons Representation Project has encountered a number of persons with arrest records that were the result of "trumped up" charges brought by perpetrators of domestic violence, combatants in custody disputes, or angry neighbors or roommates.) In 1970, a Federal Court prohibited employers from denying applicants based on arrest records.[2] Most employers, accordingly, ask applicants only about convictions.

A major loophole, however, exists. Employers can obtain arrest information from sources other than the applicant. Thus, while a typical employment application in

---

*What is listed on a Criminal Record?*

Contrary to popular belief, a "criminal record" is not simply a record of convictions. All arrests or citations (other than traffic offenses), regardless of court disposition, appear on the records of the state's central repository [the Criminal Justice Information System (CJIS)], and on the reports provided by private background check companies. Convictions will be noted, but the record also will contain non-conviction dispositions, such as:

•• *Case Dismissal: Where the court finds that the state's evidence, even if true, is insufficient to find guilt.*

•• *Acquittal: Where the defendant is put on trial and found Not Guilty by a judge or jury.*

•• *Probation Before Judgment: Where sufficient evidence to convict may be present, but the court allows the defendant to escape the stigma of conviction through an agreement to abide by terms of probation.*

•• *Nolle Prosequi: Where the State's Attorney decides not to prosecute the case because the charge is spurious, witnesses are unavailable, etc.*

•• *Placement on the Stet Docket: Where, by agreement, the trial of a case is postponed on the condition the defendant avoid further arrest for one to three years. If the condition is broken, the case is resurrected and the defendant tried on the new and "stetted" charges. If the condition is fulfilled and three years have passed, the case cannot be resurrected*

2

Maryland will inquire only about convictions, background check companies supply employers with records of convictions AND arrests not resulting in conviction.

## B. Statutory Bars to Employment

### 1. School Employees: Persons Convicted of Sexual Crimes or Crimes Of Violence

In 1999, the General Assembly prohibited school boards from hiring, as a non-certificated employee, any person convicted of a crime of violence or sexual abuse.[3] Crimes of violence include murder, rape, robbery, robbery with a deadly weapon, carjacking or armed car jacking, first or second degree sexual offense, use of a handgun in the commission of a felony or crime of violence, an attempt to commit any of the these offenses, assault in the first degree, and assault with intent to murder, rape, rob or with the intent to commit a first or second degree sexual offense.

### 2. Respite Care or Personal Care Attendants: Persons Convicted of A Felony or Any Crime Involving Moral Turpitude or Theft

Individuals seeking employment as Personal Care Aides or Respite Care Workers are disqualified by state regulations from employment in these areas if they have been "convicted of, received a probation before judgement for, or entered a plea of nolo contendere to a felony or any crime involving moral turpitude or theft."[4] Moral turpitude is a subjective legal term (see Text Box).[5]

> *What is a Crime of Moral Turpitue?*
> Moral turpitude is a broad term that is not specifically defined by law, but a number of court decisions have concluded that it involves both "infamous"(felony) crimes and lesser crimes that show a disregard for social values and relations. This latter category appears to be a function of circumstance, as Maryland courts have found indecent exposure, prostitution, solicitation, disorderly conduct, attempted rape, heroin possession, breaking and entering, and motor vehicle offenses *not to be crimes of moral turpitude.* On the other hand, statutory rape, injuring a race horse, and breaking portions of a tobacco hogshead all were found to be crimes of moral turpitude.

### 3. Dependent Care Providers: Persons With Criminal Histories Indicating Potentially Harmful Behavior

State regulations governing a number of dependent care programs prohibit the employment of caretakers with criminal histories that indicate behavior that is "potentially harmful" to those under their care. Specific crimes are not enumerated in these laws, and no distinction is made between arrests and convictions. The following employees are subject to this subjective standard:

- *Staff at Assisted Living Programs* [6]
- *Personal Care Aides and Respite Care Workers*[7]
- *Developmental Disabilities Workers*[8]

### 4. Correctional Officers: Persons With Felony and Misdemeanor Convictions

3

An applicant for a Uniformed Correctional Officer position is to be rejected, by law, if he or she has a felony conviction for aggravated assault, murder or manslaughter, robbery, arson, kidnapping, a handgun or weapon-related violation, a first, second, or third degree sexual offense, or two or more felonies resulting from the same incident.[9]  Additionally, conviction of *any offense* that resulted in incarceration is disqualifying if less than 10 years have passed since the applicant was released from incarceration or terminated from parole or probation, whichever last occurred.[10]  Three or more misdemeanor convictions are also disqualifying if at least one was for an offense involving violence or moral turpitude and a term of imprisonment was served for any one offense.[11]

## C. <u>Statutorily Required Background Checks</u>

The following jobs require, by law, employers or licensing authorities to examine the criminal history of potential employees or licensees.  Little specific guidance is given as to who should be rejected, but as the subsequent section on "Negligent Hiring" indicates, a background check can easily operate as a bar to employment for persons with any criminal history.

### 1. **Facilities and Individuals That Care For Or Supervise Children**

Since the mid-1980s, employees in facilities that care, supervise, or have access to children must be subjected to criminal history checks.[12]  Such facilities include:

- licensed child care institutions, centers, and homes
- family day care homes subject to registration
- juvenile detention, correction or treatment facilities
- public and private schools
- foster care homes, including group facilities
- government operated recreation centers or programs
- day or residential camps.

> *The Scope of Background Checks: State, Federal, Juvenile?*
> Criminal charges are resolved in court, and are public records. While any employer can conduct a record search at a courthouse, most employers rely on  private background check companies which charge by the scope of the search. Typically, employers seek only Maryland records.  While the FBI maintains a record of all charges regardless of the state, use of the FBI database must be authorized by law. Unauthorized employers could accomplish the same end by asking background check companies to search records in all fifty states, but the cost would be prohibitive. The state repository of criminal records, CJIS,  records only charges brought in the state of Maryland but can obtain national FBI data where authorized by law.  Juvenile court records are sealed and are not available legally to any employer.  Anecdotes abound about employers who access FBI or juvenile records unlawfully.

These inquiries, done through the Maryland Department of Human Resources, must include review of national (Federal Bureau of Investigation) and state records.  (See Text Box.) Volunteers at such facilities or at local departments of Social Services *may* by subjected to a similar background check.

4

Employees at these facilities are required by law to disclose convictions, probations before judgement, or pending charges, and may be subject to fine or imprisonment for their failure to disclose.[13] Additionally, the law protects child care employers and agencies that deny or terminate individuals based on criminal background investigation from civil and criminal liability.[14]

### 2. Health Care Facilities

All potential employees in adult dependent care programs must be screened for criminal history prior to employment[15]. This includes adult day care facilities, assisted living programs, group homes, home health services, congregate housing services, hospices, and related institutions. The screen can be conducted through state repository of criminal records, the Criminal Justice Information System (CJIS), or through a private company. If the investigation is conducted through a private entity, the background check must include a review of records in every state in which the employer knows or has reason to know the employee has worked or resided during the last seven years.

A dependent care employee who fails to disclose a conviction, pending charges, or attempted criminal offenses, is subject to fine or imprisonment.[16] Individuals who wish to contest the contents of a criminal history issued by CJIS may obtain a hearing with the Department of Public Safety and Correctional Services.[17] As with child care facilities, the law protects employers and agencies that deny or terminate individuals based on criminal background investigation from civil and criminal liability.[18]

### 3. Taxicab Drivers

Individuals seeking taxicab driver's licenses must submit to the Public Service Commission a criminal history records check done by the state repository, CJIS. The Commission may deny the license if a conviction bears a direct relationship to the applicant's fitness to serve the public as a for-hire driver.[19]

### 4. Drivers for Government or Non-Profits

A driver employed or offered employment by a government unit or non-profit organization must have a criminal background check completed before the first day of the driver's employment.[20]

### 5. Department of Juvenile Justice Personnel

The Department of Juvenile Justice must conduct national and State criminal history record checks for each employee of the Department within the first month of employment.[21]

### 6. License for Security Systems Technicians

5

Applicants for registration as security systems technicians must submit themselves to a national and state search of criminal records done by CJIS, unless the applicant can prove they are licensed or registered in another state with requirements similar to Maryland.[22]

## D. Statutorily Suggested Background Checks

In the following arenas, the General Assembly has authorized, but does not require, employers or licensing agents to examine the criminal histories of applicants. While enacted during a time when access to criminal records had to be authorized by law, these laws are hardly quaint anomalies. As with the background checks that are required by law, these statutes put employers and licensing agencies on notice that a heightened scrutiny is advisable, and frequently result in bars to employment and/or licensing for ex-offenders.

### 1. County Employees (Howard, Anne Arundel, and Carroll)

The County Administrator may request a Maryland and Federal criminal check for any prospective employee of Howard, Anne Arundel, and Carroll Counties. In Carroll County, however, requests are limited to applicants for positions that involve inspections, handling of money, approval or denial permits, licenses, or other grants of authority, as well as work with the County Commissioners, sheriffs, State's Attorney, circuit court, county attorney, and contracting jobs involving security or personnel or files, the county courthouse, county jail, State's Attorney's office, commissioners office, or county attorney's office.[23]

### 2. Fire Department/Rescue Squad Personnel

Fire Departments and Rescue Squads of the State or any of its political subdivisions, may request the State Fire Marshal or other authorized agency to conduct a criminal background check on an applicant for employment or appointment as a volunteer or paid fire fighter, rescue squad member, or paramedic. They may obtain conviction and arrest records which are products of a criminal history records check, but are restricted to considering only the existence of *criminal convictions* in determining whether or not an applicant will be appointed or employed.[24]

### 3. License for Pharmacists

The state Board of Pharmacy may deny, suspend or revoke a pharmacist's license if they are convicted of or plead guilty or nolo contendere to a felony or to a crime involving moral turpitude, regardless whether there is an appeal or any other proceeding pending to have the conviction or plea set aside.[25]

### 4. License for Heating, Ventilation, Air Conditioning, and Refrigeration Contractors

The state Board of Heating, Ventilation, Air Conditioning and Refrigeration Contractors may deny, suspend, or revoke a license if the applicant is **convicted** of a felony, or a misdemeanor that is directly related to the fitness and qualification of the applicant to provide heating, ventilation, air-conditioning, or refrigeration services.[26]

6

The Board must consider: the nature of the crime; the relationship of the crime to the activities being authorized; with respect to a felony, the relevance of the conviction to the fitness and qualification of the activities being authorized; the length of time since the conviction; and the behavior and activities of the applicant before and after the conviction (i.e., rape conviction was not sufficient grounds for denial).[27]

## 5. License for Engineers

The state Board of Registration may deny, remand, revoke, suspend, an applicant/licensee's license if they are convicted of a felony, or a misdemeanor that directly relates to the fitness and qualification of the job, or is guilty of gross negligence, incompetence, or misconduct while practicing engineering.[28]

## 6. All Licenses

Any licensing authority in Maryland may require an individual to disclose whether they have ever been convicted of a controlled dangerous substance offense committed on or after January 1, 1991. The licensing authority is authorized, in its discretion, to refuse to issue the license or issue a license with terms and conditions to any person so convicted. Similar discretion is authorized if an applicant fails to disclose.[29]

## E. The Negligent Hiring Doctrine

As no employer is prohibited by law from doing a criminal background check on a prospective employee, state laws that authorize but do not require such background checks are mystifying absent an understanding of a form of employee liability developed by judicial caselaw known as the "Negligent Hiring" cause of action, or doctrine.

Under the negligent hiring cause of action, employers are potentially liable for hiring or retaining employees who are unfit and who consequently injure a third person. To prevail, an injured party must show that the employer had a duty to use reasonable care in selecting its employees and its breach of that duty proximately caused harm to the third party. In determining whether an employer exercised reasonable care, the key inquiry will be whether the employer knew or should have known that the individual was potentially dangerous.

According to the leading treatise on Maryland employment law:

> As a general rule, employers are not legally obligated to routinely look into the criminal records of an applicant. Moreover, even when an employer hires an applicant with a known criminal background, this fact alone does not constitute a prima facie case of negligent hiring...If the information about criminal convictions is readily available, there can arise a duty to review this information. In this regard, the [court] must consider

7

all of the circumstances to determine whether the failure to obtain a criminal history constituted a breach of the duty of care.[30]

The treatise's ambivalence is the result of cases tried to date under the doctrine.[31] In one 1983 case, a bartender with a criminal record for assault shot a customer, but the employer escaped liability because the employer received assurances from the bar's prior owner that the employee was a good bartender. No criminal record check was made. Two years later, however, the Montgomery County Housing Opportunities Commission was found negligent in failing to conduct a background check on a building inspector who had a record of assault, robbery and a pending rape charge. In its ruling, the Court of Appeals noted the relative ease the employer had in obtaining the record.

Given the ease with which employers now can acquire criminal histories, an employer would be careless not to conduct a background check, given the current state of the negligent hiring doctrine. In considering all the circumstances in a case under the doctrine, there is little doubt that where state law requires or

> **What About Fidelity Bonds?**
> A Fidelity Bond is a business insurance policy that protects the employer in cases of employee dishonesty (theft of money or property). Such policies can cover employees by groups or by individual. Since 1966, the U.S. Department of Labor (DOL) has operated the Federal Bonding Program, which facilitates the issuance of individual Fidelity Bonds for ex-offenders, ex-addicts, and those with poor work histories or credit. Bonds are issued through the Travelers Property Casualty insurance company and cover a potential employee for the first six months of employment for employer losses up to $5,000. The bond is provided free to the employer during this initial period, and if no dishonesty is alleged, Travelers will offer the employer additional coverage at regular commercial rates (roughly $150 annually per employee). Until passage of the Workforce Investment Act (WIA) in 1997, DOL purchased these bonds and made them available. Since then, bond purchases can be made only through state and local governments, or employment programs. Thirty-one states currently participate in the program by purchasing the bonds. Maryland is not one of them, although three Maryland based employment programs–the Career Transitions Center in Wheaton, the Eastside Career Center in Baltimore, and the U.S. Probation Office for the Maryland District–have purchased bonds (which cost $2,450 for a package of 25). An attempt to create a state funded pilot program involving bond purchase failed in the 2001 General Assembly Session. Despite its successful track record–99% of employees bonded have proven to be honest–the program has remained underutilized. It is estimated that 60% of employers do not carry *any* insurance relative to employee dishonesty. The bonds cannot assuage employer fears about the Negligent Hiring Doctrine, as they cover only employee dishonesty and not harmful actions toward customers and other third parties.

authorizes criminal background checks for certain occupations a strong legal argument can be made that this places employers under a heightened duty of care in the screening and selection of employees. While these background check authorization laws may not preclude hiring persons with criminal histories, litigation-shy employers nevertheless will exclude applicants with criminal histories, regardless of the nature of the charges or their disposition.

## F. Expungements, Pardons and Probations Before Judgement

The only rehabilitative tools provided by public policy to ex-offenders in Maryland are criminal record expungement, Gubernatorial pardon, and the Probation Before Judgement disposition option. Each tool has significant limitations.

8

## 1. Expungements

Criminal record expungement, which involves petitioning a court to "seal" or destroy criminal records, is a limited option in Maryland, applying only to charges that *did not result in conviction.* In short, only charges that were dismissed or where the defendant received an acquittal, probation before judgement, nolle prosequi, or stet are eligible for expungement. A waiting period of three years is required. Charges which were pardoned by the Governor also can be expunged after a waiting period of five years.

Expungement rights, however, can be extinguished if the charge sought to be expunged involved a probation before judgement, nolle prosequi, stet or pardon, and the applicant has been *subsequently convicted of a crime carrying a possible sentence of imprisonment.* For example, an individual charged with a crime in 1984 that was not prosecuted by the State (nolle prosequi), and then who was subsequently convicted of a crime in 1989, loses his or her right to expunge the 1984 charge upon conviction of the 1989 offense.

The beneficiary of an expungement may treat the charge as if it never occurred, and employers must do the same.[32]

## 2. Pardons

While a charge eligible for expungement must be expunged upon petition to a court, a pardon is strictly a discretionary act, which the Governor alone has the power to grant. As the Court of Appeals observed in 1950, a pardon is an "act of clemency, evidenced by an executive order signed by the Governor, absolving the convict from the guilt of his criminal acts and exempting him from any pains and penalties imposed upon him by law."[33] A pardon essentially commutes any sentence imposed. It does not remove the charge from the individual's criminal record, though the pardon may be noted. A separate expungement petition, filed five years after the pardon is granted, must be submitted to expunge the charge.

Governors generally rely on the Maryland Parole Commission to accept and evaluate pardon applications. The Commission adopts guidelines, which currently require misdemeanants to be crime free for a period of at least five years from release from incarceration, parole or probation (whichever last occurred), and felons to be crime free for ten years. (The Commission may, at its discretion, consider cases where only seven years have elapsed.) Felons convicted of crimes of violence or crimes involving controlled dangerous substances, must be crime free for 20 years, though the Commission may consider cases where only 15 years have elapsed.

## 3. Probation Before Judgement

The Probation Before Judgement, or "PBJ," is a disposition available to a sentencing court. Created by the legislature in 1955, the option is perhaps the only statute that recognizes ex-offenders suffer certain civil disabilities and attempts to ameliorate them. Like expungements

9

and pardons, however, the promise is greater than the reality.

Md. Crim. Pro. §6-220 (b) states that whenever a person pleads guilty or nolo contendere or is found guilty of an offense, a court, if satisfied that the best interests of the person and the welfare of the state would be served thereby, may stay the entry of a conviction, defer future proceedings, and place the person on probation subject to reasonable terms and conditions as appropriate. The terms may involve payment of a fine or restitution, or attendance at a rehabilitation program or clinic. If the probation is violated, the court may then enter judgement and proceed with disposition as if the person had not been placed on probation. (A PBJ is not available where the charge is rape, sexual offense, or a second or subsequent drug related crime.[34])

According to Md. Crim. Pro. §6-220(g),

> Upon fulfillment of the terms and conditions of probation, the court shall discharge the defendant from probation....Discharge of the defendant under this section shall be without judgment of conviction and is not a conviction for purposes of any disqualification or disability imposed by law because of conviction of a crime.

In theory, a PBJ should be viewed by employers as an arrest that did not result in conviction. In practice, however, many employers understand that a plea or finding of guilt was involved, and view the offense as a conviction. Some employers, hoping to avoid any claim that they are using arrest, rather than conviction records, against a potential employee, have asked structured their employment applications or interviews to ask about occasions when the applicant has "been found guilty or pled guilty or nolo contendere to a charge."

In short, a PBJ is advantageous only if expunged, which can occur only after a three year waiting period (if the petitioner avoids any conviction for an offense that involves incarceration).

## G. Consumer Reporting Agencies

Employers in Maryland acquire criminal histories primarily through consumer reporting agencies– businesses that engage in the practice of assembling and evaluating information that relates to a person's credit worthiness, credit capacity, character, general reputation, or mode of living. These agencies are subject both to federal law (the "Federal Fair Credit Reporting Act") and state law (to the extent that it is consistent with federal provisions). While enacted in the 1970s and amended numerous times since, these laws still provide ex-offenders with "informational" rights relative to criminal history reports and their use. However, the most substantive protection of these laws– a federal provision that prohibited reporting agencies from reporting arrest or conviction information that was older than seven years– was eliminated by

10

Congress in 1998. State law, however, maintains the seven year limit on reporting arrests and convictions. While it seems clear to most legal experts that Maryland's law should control, a number of reporting agencies have concluded that federal law in this arena preempts state law, and are providing reports with no temporal limitation.

## 1. The Prohibition on Reporting on Criminal Records Older Than Seven Years

Originally, the Federal Fair Credit Reporting Act prohibited consumer reporting agencies from providing any consumer report to a third party that contained "records of arrest, indictment, or conviction of a crime which, from date of disposition, release, or parole," antedated the report by more than seven years.[35] This prohibition did not apply where the report was used for employee evaluation purposes where the annual salary of the job at issue was $20,000 or more. Maryland adopted identical provisions in 1976.[36] In short, reporting companies could provide *complete criminal histories* only to employers who paid relatively higher wages (greater than $11 per hour). In 1996, Congress made this access to complete criminal histories available only to very high wage employers by raising the salary floor in the law to $75,000 annually.

In an abrupt about-face, however, Congress amended the provision in 1998 to allow reporting agencies to report any conviction regardless of when it occurred or the salary of the job at issue.[37] The change was made apparently to allow unlimited access to conviction information for employers in the child and dependent care occupations.[38]

State law, however, has not been amended and still restricts reporting of any information, convictions or non-convictions, that is older than seven years (though the restriction applies only to jobs expected to pay less than $20,000 in annual salary).[39] Most reporting agencies with which the Homeless Persons Representation Project has had contact, have cited the federal law amendments of 1998 as permission to ignore this state law and are reporting conviction histories of employment applicants, regardless of the time of conviction. Some are going a step further: including all arrest (non-conviction) information, regardless of the time of the charge–an action that appears unlawful even under the federal amendments.

A recent opinion by an assistant Maryland Attorney General indicates that reporting agencies in Maryland must follow the provisions of law that provide more protection to the subject of the report (the "consumer").[40] This creates a bifurcated structure, separated by salary and criminal charge disposition:

1. *Conviction information that is older than seven years* cannot be reported to a third party, under state law, if the job sought is expected to pay $20,000 annually or less;

2. *Non-conviction information that is older than seven years* cannot be reported, under federal law, if the job sought is expected to pay $75,000 annually or less.

The Attorney General opinion admitted that the matter was "not free from doubt."[41] It appears that only litigation will resolve the issue conclusively.

11

## 2. Notice of Report to Applicant

Under both federal and state laws, reporting agencies that compile and make a report to a third party of "public information," must notify the subject of the report that such information has been provided to the third party if the information is likely to have an adverse impact on the subject's ability to obtain employment.[42] The notice is to identify the third party to whom the information is being reported.[43] While the reporting agencies must, by law, maintain "strict procedures" to insure that such public information is complete and up to date, this duty is fulfilled simply by reliance on the public record at the time the report is issued.[44] In short, inaccuracies or failings by the public agency will not make the reporting agency legally liable.

## 3. Notice of Rejection to Applicant Based Upon Report

Employers who use a report by a consumer reporting agency to deny employment to an applicant, must notify the applicant that such report was used and provide a means for the applicant to obtain the report.[45] This provision is particularly useless for applicants because it does not require the employer to explain how it used the report, nor does any Maryland or federal law require an employer to detail the rationale for an employment rejection.

The Homeless Persons Representation Project repeatedly has encountered situations where employers deny employment to applicants with short statements such as "there was some problem in your background check." When asked to explain further, employers hide behind the credit reporting acts' notice of rejection provision, directing the rejected applicant (in writing) to the consumer reporting agency for details. Believing that the agency will provide a written explanation of the employment denial, the applicant makes a request to the reporting agency for the background report and waits a few weeks for a reply. The reporting agency then provides the applicant with the criminal history that was supplied to the employer, but disclaims any involvement in the employment rejection. The applicant is directed by the reporting agency back to the employer for details of the rejection. By this time, weeks have passed and the applicant usually finds it impossible to get the employer to respond to any request for information. Rejected applicants are left knowing that their criminal histories were the basis for employment rejection, but are not given any idea was to the  charge or charges the employer found offensive, or the employers' policies relative to ex-offenders.

## 4. Remedies Under Reporting Agency Violations

Reporting agencies are liable for willful and negligent non-compliance with federal and state law in this area. Adversely affected individuals can sue the agency for damages, or can file a complaint with the Department of Labor, Licensing and Regulation, who will investigate and fine the agency if a violation is confirmed.[46]

## H. **Other Civil Disabilities**

Public policies relative to ex-offenders are not limited to the employment realm.

12

Longtime restrictions on voting have now been joined by bars to Public Benefits and Public Housing.

### 1. Voting

The Maryland Constitution of 1851 prohibited any person convicted of"larceny"or any "other infamous crime" from voting. This specificity was reduced by a 1972 Constitutional amendment to a general charge to the General Assembly to "regulate or prohibit the right to vote of a person convicted of infamous or other serious crime." The legislature originally implemented the constitutional authorization by passing a statute that disqualified those convicted of more than one "theft or infamous crime." While the term "infamous crime" has never been defined by the legislature, it has been illumined by two opinion letters of the State Attorney General, and appears to include all felonies.[47]

In 2002, the General Assembly modified this bar, permitting those with more than one felony conviction to vote, provided three years have passed since sentence completion and provided that the individual has not been convicted of two or more crimes of violence.[48]

### 2. Public Housing And Section 8

Federal law requires public housing authorities to conduct criminal background checks on all adult applicants *and applicant family members*. Households are barred if any family member:

- •• was convicted of manufacturing or producing methamphetamine on the premises of federally assisted housing;
- •• is subject to a lifetime registration requirement under a State sex offender registration program; or
- •• was evicted from federally assisted housing within the prior three years for drug related criminal activity (though efforts at rehabilitation since the eviction will be considered).

More importantly, federal law gives public housing authorities the discretion to reject an applicant, who has engaged in during a reasonable time before admission:

13

- • drug related criminal activity;
- • violent criminal activity; or
- • other criminal activity which may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents or persons residing in the immediate vicinity.[49]

This general charge has been used by Public Housing Authorities, particularly Baltimore City's, to reject applicants with any criminal history, *regardless of the nature of the charge or its disposition.* While applicants are given an opportunity to "appeal" the Authority's decision and provide evidence of rehabilitation, the process is arbitrary in nature and not subject to judicial review.

### 3. Public Benefits

Federal Welfare Reform, in the form of the Personal Responsibility and Work Opportunities Reconciliation Act (PRWORA) of 1996, and the Balanced Budget Act of 1997, denied Food Stamps, Temporary Assistance to Needy Families (TANF), and Emergency Assistance benefits to individuals convicted of drug related felonies after August 22, 1996. States were allowed to opt out of this via legislation. Maryland chose a modified "opt out" in 2000, permitting *custodial parents* convicted of drug related felonies since August 22, 1996, who agree to comply with drug testing and treatment regulations, to receive these benefits (and Welfare Avoidance Grants.)   However, custodial parents convicted of a drug related felony on or after July 1, 2000, are barred from such benefits for one year from the date of conviction. Singles, who are not eligible for TANF or EA, remain barred from Food Stamps for drug related felony convictions.

Additionally, persons convicted of trading or trafficking Food Stamps are subject to temporary or permanent disqualification from the program.

### I. Conclusion

States are justified in attempting, through their public policies, to strike a balance between the twin goals of protecting the public and rehabilitating the ex-offender. Maryland, however, makes no such attempt. Public policy is skewed heavily toward public safety, as Maryland sports at least 26 laws that either prohibit the employment of ex-offenders or require criminal background checks that operate, with the negligent employer doctrine, to discourage hiring. The few tools that exist for ex-offenders– probation before judgements, expungements, and pardons– are severely limited in their applicability and impact. Maryland does not recognize a public interest in the employment of ex-offenders, and thus has not required employers to take this interest into account when hiring. Several states, however, have recognized the interest in varying ways, and with varying results.

14

### III. NEW YORK

Few states have done more than New York in attempting to level the playing field for ex-offenders seeking employment. Enacted in 1976, New York's statute takes a two-pronged approach to achieve its ends:

- • Employers must consider eight factors prior to making a hiring decision relative to an ex-offender; and

- • Ex-offenders can secure a *Certificate of Relief from Civil Disabilities* or a *Certificate of Good Conduct* from the state that must be accepted by an employer as presumptive evidence of the employee's rehabilitation.

No employer is required to hire an ex-offender, and employers and licensing authorities can deny employment or licenses to persons if there is a "direct relationship" between a previous criminal offense and the specific license or employment sought, or if the issuance of the license or granting of employment would involve "an unreasonable risk to property or to the safety or welfare of specific individuals or the general public."[50]

A look at the details and history of the law show that New York attempted to strike a balance between the twin concerns of public safety and ex-offender rehabilitation. The objective and subjective evidence suggest that this balance has yet to be achieved.

### A. The Statute
### 1. History

New York's law has its origins at the Federal level. In the mid-1970s, cases before federal judges and the Equal Employment Opportunities Commission (EEOC) produced a series of rulings that limited the ability of employers to discriminate against minority applicants with criminal histories. Citing studies indicating that minorities were more likely to be involved in the criminal justice system than whites, these federal authorities concluded that alleged "neutral" hiring policies that excluded those with criminal records, disproportionately excluded minorities thereby violating Title VII of the Civil Rights Act.[51]

The EEOC, in policy statements, advised that employers must show a "business justification" for their criminal background check policies. The policy identified three factors relevant to business necessity: 1) the nature and gravity of the offense or offenses; 2) the time that had passed since the conviction and/or completion of the sentence; and 3) the nature of the job held or sought.[52]

In January, 1973, the New York City Commission on Human Rights, following these federal leads, adopted guidelines to eliminate the use of arrest records and restrict the use of criminal conviction records as job selection criteria. The Commission determined that employment opportunities could not be withheld

15

unless it can be shown that a person with that particular conviction record
could not satisfactorily perform the job in question, or that the prohibition
[on employment] is necessary to the safe and efficient operation of the
business or that a state or local licensing law or regulation prohibits the
employment of such individual.[53]

The Commission's authority to adopt such a policy, which applied to employers and
unions, was unclear. All doubt was removed in 1976, when the state legislature codified the
concept that denial of employment or licensing on the basis of a criminal history could occur
only if there was a direct relationship between the position sought and the history, or if
employment or license issuance created an unreasonable risk to property or to the safety or
welfare of specific individuals or the general public. To assist employers, agencies, and courts in
evaluating this language, the legislature created a set of factors employers or agencies were to
consider, and revamped and expanded the availability of "Certificates of Rehabilitation," which
until then were available to a limited few.

## 2. The Eight Factor Test

In practice, all employers and licensing agencies in New York must consider the
following factors in making an employment or licensing decision relative to a person with a
criminal history:

1. The public policy to encourage the licensure and employment of persons previously convicted.
2. The specific duties and responsibilities necessarily related to the license or employment sought.
3. The bearing, if any, the criminal offense or offenses will have on fitness or ability to perform one or more such job duties or responsibilities.
4. The time which has elapsed since the occurrence of the criminal offense or offenses.
5. The age of the person at the time of the occurrence of the criminal offense or offenses.
6. The seriousness of the offense or offenses.
7. Any information produced by the person, or produced on his or her behalf, relative to his or her rehabilitation and good conduct.
8. The legitimate interest of the public agency or private employer in protecting property, and the safety and welfare of specific individuals or the general public.

Consideration of all these factors can mean varying outcomes for those with different
criminal histories. Drunk driving convictions were found to a lawful concern of the New York

16

City Fire Department because of the risk to the safety and welfare of the general public.[54]   Yet, an 11 year old "manslaughter conviction" was found not to be directly related to a housing caretaker position, involving sweeping, mopping, spreading sand and salt, changing light bulbs, gardening and garbage collecting in public housing projects.[55]  Nine prostitution convictions during a period of drug addiction combined with a manslaughter conviction (where a minimal sentence was imposed because it involved self-defense), also were found not to be enough to disqualify an applicant from a job with the state human services agency as an "Eligibility Specialist."[56]

The only certainty about the eight factor test is that employers and agencies are prohibited from employing hard and fast rules against those with convictions, and are required to treat applicants individually.

### 3. Certificates of Rehabilitation

Additionally, New York gives ex-offenders an affirmative tool in their quest to appeal to employers: certificates issued by legal authority that allegedly remove any "bars" to employment that the certificate holder encounters because of his or her criminal history.  Two certificates are available in New York, depending on the circumstance.  Each creates a "presumption of rehabilitation in regard to the offense or offenses specified therein."[57]

### a. Certificate of Relief From Disabilities

This certificate is available to those with who were convicted of misdemeanor crimes or no more than one felony offense.  A separate certificate must be obtained for each conviction. Misdemeanants must petition the sentencing court for the certificate, while felons must apply to the state Parole Board.  In each case, the applicant will be investigated (by either the court's probation department or the state Parole Board).  According to the Parole Board, the applicant must submit documentary evidence of financial support for the prior three years, along with evidence of stability and good citizenship.  The Board then obtains the applicant's complete criminal history, any pre-sentencing report that had been prepared relative to the applicable offense, and solicits input from the local parole office familiar with the applicant.  The process takes up to six months.

### b. Certificate of Good Conduct

This certificate is available to those with more than one felony conviction.  A period of good conduct is required for these applicants, depending on the nature of the felony.  Five years of good conduct must be shown for those convicted of Class A or B felonies, while three years of good conduct must be shown for convictions of Class C, D, or E felonies.  Applications are made to the Parole Board and are subject to the same investigatory process used for Civil Disability Certificates.

### c. Practical Effect of Certificates

17

While the law requires that the Certificate holder be entitled to a "presumption of rehabilitation," the presumption is somewhat difficult to define. Where certain occupations (i.e. school bus driver, personal care attendant) have been deemed, by statute, off limits to certain felons in New York, the Certificate removes the legal bar, yet does not guarantee employment. Employers and licensing agencies can overcome the presumption by use of the Eight Factor Test. In fact, a review of judicial decisions indicates that Certificates appear to be subservient to the Eight Factor Test, often operating simply as factor #7 in the test (evidence of rehabilitation).[58] Only when the employer or licensing agent failed to produce any evidence that it employed the eight factors, did a court find the presumption due a Certificate holder controlling.[59]

For occupations without statutory bars, the Certificate appears to operate as a "character reference" done by the probation department or parole board. In short, public funds are used to conduct the background investigations usually carried out by private employers.

The Board of Parole, which handles all felony related Certificate applications, reports that it processes 300 petitions annually, granting the Certificate in 90% of the cases.[60]

### 4. Notice Provisions

Any person with a conviction who has been denied a license or employment in New York, can request a written statement from the employer or licensing authority. The employer or agency must provide the statement, which must set forth the reasons for the denial, within thirty days of the request.[61]

### 5. Enforcement

An aggrieved person under the New York law may has a choice of enforcement agents, depending on the nature and location of alleged discrimination. The rejected applicant can file a lawsuit or can utilize various administrative agencies for enforcement. The routes, however, are exclusive: litigation will preclude administrative enforcement and vice versa.

Those denied employment by a private business may file, within one year, a complaint with the New York State Division of Human Rights. The Division, which handles all discrimination complaints relative to employment and housing, is required to investigate the complaint and determine whether there is "probable cause" to believe the law was violated. If probable cause is found, the Division can coax the parties to settle the case through conciliation agreements, or can, after a hearing, order the employer to hire, reinstate or upgrade an employee with or without back pay, and award compensatory damages.

If the alleged discrimination occurred in New York City, the aggrieved has the option of filing a complaint with New York City Commission on Human Rights. Such a complaint would proceed under the New York City Human Rights law, which is identical to the state law relative to employment discrimination against ex-offenders.

18

If the alleged discrimination was perpetrated by public agency, the applicant for employment may pursue an administrative appeal through the same administrative agency that acted against him or her.

### B.  Objective Evaluation

The numbers alone suggest that unlawful discrimination against ex-offenders in New York is not enough to complain about.  According to the New York Division of Human Rights, while complaints relative to employment discrimination make up the bulk of all discrimination complaints, few are filed by ex-offenders.  In Fiscal Year 2000, 101 complaints were filed by ex-offenders alleging unlawful consideration of the "8 Factor Test" or a Certificate, constituting 1.9% of the 5,289 discrimination complaints filed in New York in Fiscal Year (FY) 2000.  Given that roughly nine out of every ten discrimination complaints filed with the Division are employment related, the ex-offender complaints are quite small.  The numbers for the prior year, Fiscal Year 1999, are similar.  Of the 5,729 total complaints filed, only 2.2% alleged violation of the ex-offender provisions.

### 1.  Ex-Offender Claims Compared to Total New Hires

While most employers see any discrimination complaint as an anathema, a comparison of ex-offender complaints actually filed with the number of labor market transactions where an



19

employer theoretically was at risk of violating the law, shows most employers had little to fear.

New York, like most states, saw steady and sustained economic growth in the late 1990s. In 1999 and 2000, New York state created private sector jobs more rapidly than the nation. Year end data from 2000, showed that New York's private sector employment averaged 7,168,900, up 158,700 from 1999. Employment increased fastest in construction and services. The data include only new job openings due to economic growth (firms moving into or expanding in the state). Data on net replacement (jobs created by persons leaving an occupation and not expecting to return) are unavailable. Even with this partial picture, the number of ex-offender complaints about employment discrimination make up .06% of the total number of new hire labor market transactions in New York. Were net replacement transactions included, the proportion would drop even further.

### 2. Disposition of Ex-Offender Claims

A look at the disposition of those claims actually filed by ex-offenders also suggests that few labor market transactions in New York run afoul of the law. As noted earlier, the New York Division of Human Rights must investigate each claim filed with it and can employ a host of options if it has reason to believe an employer has acted unlawfully. In both FY 1999 and FY 2000, one-third to one-half of all complaints filed by ex-offenders fell victim to administrative



## Discrimination Claims By Ex-Offenders
### Compared to Total New Hires FY 2000

FY 2000



New Job Openings

Discrimination Claims By Ex-Offenders

backlog at the Division. Of the 45 cases resolved, 23 were found to have "no probable cause" of discrimination, while six claimants withdrew claims after receiving settlement offers, six others

20

attended settlement or mediation conferences with employers, and in one additional case a probable cause hearing was held by the Division. Three cases filed with the Division also were filed in court as "parallel proceedings." Division data do not reveal the results of the probable cause hearing, conferences, or court cases. Assuming (unrealistically) that all of theses were resolved in favor of the employee, roughly one-third of the resolved cases in FY 2000 involved unlawful conduct by an employer.

In FY 1999, 43 of the 127 claims filed are still "pending" or unresolved. Another 45 claims have been dismissed with "no probable cause," while the agency determined in 12 that it lacked jurisdiction. Of the remaining 84 resolved cases, 12 were withdrawn after employees received beneficial settlement offers from employers, eight involved settlement conferences with employers (results unknown), two probable cause hearings and/or conferences were held, and two cases also were filed in court as "parallel proceedings." Again, assuming each of these events were resolved in favor of the employee, less than one-third involved unlawful conduct by an employer.

| Results of Discrimination Claims Filed By Ex-Offenders Vs. Employers | | |
|---|---|---|
| FY 1999 | | FY 2000 |
| 127 | Total Complaints By Ex-Offenders | 101 |
| 43 | Unresolved or Unknown Disposition | 56 |
| 84 | Resolved Cases | 45 |
| 24 | Resolved Cases "Adverse" to Employer | 13 |
| 29% | Proportion of Cases Resolved "Adverse" to Employer | 35% |

SOURCE: NY State Division of Human Rights (May, 2001).

The above does not include cases disposed of by the New York City Commission on Human Rights where conviction history was asserted as a basis for discrimination. Inclusion of City data, however, makes little difference. In the last five years, only 50 discrimination cases have been filed with the Commission relative to criminal backgrounds, and only three involved a settlement with benefits to the claimant or conciliation conferences. Using the same assumptions as above, it can be said that claimants who file their discrimination claims with the New York City Commission prevail roughly 6% of the time.

### 3. Ex-Offender Claims Compared to the Total of Ex-Offenders

In each of last four years, the New York state correctional system has released 26,000 to

21

30,000 inmates.[62] Most studies indicate that anywhere from 14% to 32% of these Correctional system discharges are employed at the time of release.[63] This means that anywhere from 20,400 to 25,800 inmates discharged from the New York correctional system annually are in need of employment upon release. Even without considering the cumulative effect of these annual releases, it is shocking that only 100 to 127 employment discrimination complaints are filed each year by ex-offenders, and that only 300 annually seek Certificates of Rehabilitation. While these numbers suggest employment discrimination against ex-offenders has been virtually eliminated in New York, other subjective evaluations of New York's system indicate otherwise.

## C. Subjective Evaluation

Those who work with ex-offenders in New York sound a similar theme when asked to assess their system: the law is preferable to no law, but it has not solved the problem that ex-offenders face in the labor market. Broad-based hiring prohibitions by employers, which are clearly unlawful, still occur; Certificates of Rehabilitation are difficult for both employer and employee to understand; and ex-offenders generally do not seek to enforce the anti-discrimination laws. One group that works regularly with ex-offenders believes New York's current system is in need of overhaul, and is pushing a significant statutory amendment.

### 1. Broad-Based Hiring Prohibitions

As employers in New York are required to consider eight separate factors before rejecting an ex-offender, the state should be devoid of all broad based hiring prohibitions. This is not the case, however, though such prohibitions appear to occur infrequently and are generally limited to businesses headquartered outside of New York.

United Parcel Service(UPS) and Kentucky Fried Chicken (KFC) were used an examples of the latter. According to Bobby Genn, an employee of the state Department of Labor who provides employment services to ex-offenders, both companies made offers of employment to his clients that were later withdrawn after criminal background checks. In each case the company claimed a blanket policy of not hiring ex-offenders. Both rejected applicants filed complaints with the New York State Human Rights Division. Once informed of the law, UPS offered the rejected employee $10,000 to drop the case. The employee refused, citing the long-term job stability, benefits, and increased earnings at UPS. "The last I heard, they'd offered him $20,000, " said Genn. "I don't know the final amount, but they settled somehow." With KFC, the potential employee had been hired on Thursday, purchased her uniform, and was to begin work on the following Monday when word came from the Kentucky-based company's headquarters of a blanket prohibition on hiring persons with criminal records. Despite immediate notification of the New York law, KFC insisted on hiring a New York based law firm to investigate. Two and a half months later, she was offered employment and paid back wages.[64]

An attorney working with ex-offenders, Debbie Mukumal, also mentioned airline companies headquartered outside New York as another frequent offender of the law. When informed of the law, most employers react with incredulity.[65]

22

## 2. Certificates of Rehabilitation

A typical Certificate of Rehabilitation states that it shall "relieve the holder of all forfeitures, disabilities and bars to employment." "I don't think anyone understands what that means," said labor official Genn. "Because of that, it does nothing on its own. But with a good presentation at an interview, it can be helpful. I counsel my clients to use it at the end of an interview, and to make sure the employer knows that not every ex-offender can obtain a certificate."

"They are essential for jobs with statutory bars," according to John Rakis, the former Executive Director of "South Forty," a non-profit organization that counsels prisoners and ex-offenders. "In other cases, it gives you confidence. It shows employers something. So it's great in that respect."[66]

Jim Murray, a key player in the issuance of Certificates at the state Division of Parole, agrees that they are necessary for statutory bars, but doesn't think they are useful in other employment situations. "I don't think employers look at them or the law. Employers look for experience and skills."[67]

## 3. Enforcement of the 8 Factor Test

Those who work with ex-offenders use the threat of enforcement of New York's anti-discrimination law sparingly and with tact. Negotiation with employers relative to the "8 Factors" without reference to the law, appears to be the primary and initial means for dealing with rejected ex-offenders. When all else fails, however, ex-offenders are encouraged to file complaints.

These complaints played key roles in the settlement of the UPS and KFC cases cited earlier, and it is clear that those on the side of ex-offenders appreciate the tool even if many do not use it. "I refer about 15 to 20 folks a year (to the State Division of Human Rights)," said Genn. "Only a few come back to me. Some guys can't get through the process–they lack the education or the skills."

"I refer them only if they later find employment," said Rakis. "The typical person who comes to us is in crisis and needs a job now. They're not in a good position to fight discrimination. Expedience usually wins out."

Rakis, who estimates that he has spoke with over 10,000 employers in his 11 years of service with "South Forty," reports that most employers who are ignorant of the law are receptive when informed of it diplomatically. But most who are discriminatory are savvy enough to know the laws. "They interview the applicant and ask all the right questions, but they never call back."

## 4. Overhauling the System

23

The Legal Action Center of New York, which regularly provides assistance to ex-offenders relative to obtaining Certificates of Rehabilitation and overcoming employment, housing and public benefit discrimination, believes New York employers have adopted practices to skirt the laws. In testimony before the New York City Council in support of a resolution asking the state General Assembly to adopt a modification to current state law, the Center's Senior Attorney Anita R. Marton said:

> Unfortunately, while these [current] laws were designed to protect ex-offenders from being unfairly denied jobs or occupational licenses because of their convictions, such discrimination occurs very frequently. Employers have found easy ways to get around these anti-discrimination laws. New York State law allows employers and licensing agencies to ask individuals about past convictions for criminal and non-criminal offenses. Once employers find out about an individual's past criminal history, and if employers do not wish to hire an ex-offender, they can simply deny that individual a job by stating they found a more qualified candidate. Since many ex-offenders may be entering the workforce for the first time and may not have an extensive work history, it is very difficult for them to challenge the reasons for the job denial as being pre-textual. This happens with such frequency that we often hear from clients that the word on the street is to lie on employment applications about past criminal history.[68]

The Center's ideas for overhaul, know as the "Second Chance Program," involve "sealing" (making unavailable) criminal records for non-violent offenders who demonstrate sufficient evidence of rehabilitation. Persons convicted of no more than two non-violent drug related offenses and no more then two misdemeanors would be eligible for record sealing. Violent offenders would be excluded. A five year waiting period is included in the legislation, during which time the "Second Chance" applicant must avoid any felony or misdemeanor conviction and complete certain program requirements (including public service; substance abuse treatment, if needed; and attainment of a GED or high school diploma, if not already received).

The Second Chance proposal was passed by one chamber (the Assembly) of the state legislature in the 2001 legislative session, but was not considered by the New York Senate prior to adjournment.

### D. Conclusion

Whether Certificates are useful or the 8 Factors observed, all interviewed preferred the New York system to any other state. "I'm a big believer in laws relative to ex-offenders, despite the fact I've rarely had to use them," said Rakis. "If your state doesn't have it, I'd lobby for it. The success of ex-offenders is a three-legged stool: employment, housing, and support. If any one of

24

those legs is missing, it topples. Unless there is a good reason for it, employment should not be denied."

Genn agreed. "I recommend anything out there to level the playing field. Remember, you're not requiring employers to hire anybody." Mukumal believes the New York system gives "folks different options."

In theory, Mukamal's summary appears apt for both ex-offender and employer. The New York system allows employers the freedom to reject applicants for cause, and provides ex-offenders with a handful of tools to challenge employers who refuse to hire them. In existence for 25 years, the law has not discouraged economic development in New York nor has it put them at a competitive disadvantage in attracting businesses from other states. While the use of Certificates in combination with the 8 Factor Test may appear, at first glance, to be overkill, New York appears to have an inordinate number of statutory bars

> **New York Fair Credit Reporting Laws**
>
> The New York Fair Credit Reporting Act provides an additional protection for ex-offenders. The Act, which applies to private companies that conduct background checks that include criminal histories, limits the reporting agencies to report only convictions. As with Maryland's law, information older than seven years is off limits to "low wage" employers.
>
> If a consumer reporting agency acts unlawfully, the victim can bring an action in state court within two years of the violation. The agency can be sued for actual damages (i.e. loss of employment) caused by the violation, and the costs for bringing the lawsuit, including attorneys fees. If the agency's violation of the law was knowing and willful, the agency is subject to punitive damages.

to employment based on criminal background. The existence of the Certificate gives ex-offenders the key to unlock the doors to these occupations. Employers are then free to accept or reject such applicants based on the 8 Factor Test. Additionally, Certificates in New York are not limited to the employment arena. Voting rights can be restored as can any other "right or privilege" enumerated in the Certificate.

In practice, however, it is clear that New York has not found the panacea for discrimination against ex-offenders. While Mukamal often spoke in positive terms about the current statutory scheme, her organization, the Legal Action Center is advancing a "Second Chance" proposal that would keep the criminal records of certain individuals from employer review, a dramatic departure from the philosophy of New York's current system. Further, it is clear that discrimination complaints to the state Division of Human Rights do not match the prevalence of discrimination voiced by ex-offenders and their advocates. There appear to be a number of possible reasons for this:

1.　　As suggested by the Legal Action Center, New York employers are savvy to the system and engage in pre-textual job denial, claiming offensive ex-offender applicants are simply not qualified;

25

2.    The law enforcement process is considered by most applicants to be a dead end because of difficulties proving discrimination and/or because of a perceived bias by the Division toward employers;

3.    The law enforcement process is too slow and the promise of remedy too speculative to attract rejected applicants;

4.    Ex-offenders are generally cynical about the efficacy of law enforcement in this arena.

Some of these factors also may explain the low utilization of Certificates of Rehabilitation, though it appears that the practical understanding of the use of Certificates is more limited than the law provides. Both providers of services to ex-offenders and the state Division of Parole spoke of Certificates only in the context of particular statutory bars. In short, Certificates were sought (and granted) only where the ex-offender had a good possibility of landing a job but for a statutory impediment. Issuing Certificates to a host of ex-offenders simply to allow them the general benefit of the law's "presumption of rehabilitation," appears to be a foreign concept to all in New York but Mukumal. (And without specific guidance by the legislature or judiciary, the practical effect of these presumptions is unclear.)

New York's system is ambitious and, if the Second Chance proposal is included, combines a variety of strategies for balancing the twin concerns of recidivism and rehabilitation. Given the complexity of employer practices in this arena, and the differing situations of ex-offenders, a multi-faceted approach is prudent. Any state that is serious about addressing the problems of ex-offenders and employment, would do well to use the New York approach as the keystone to building a new entryway to the labor market for ex-offenders.

26

## IV. WISCONSIN

Wisconsin's state statutory scheme relative to ex-offenders is rather similar to the New York system, absent Certificates of Rehabilitation. Wisconsin's Civil Rights law includes a general prohibition against discrimination on the basis of conviction records, yet businesses can overcome this prohibition by showing a link between the criminal history and employment sought. Until 1987, this showing was remarkably similar to New York's "8 Factor Test." A court decision that year, however, significantly altered the interpretation of the law, and reduced the protections for ex-offenders. While the general discrimination prohibition still exists, there is a genuine question about its efficacy.

### A. The Statute

Added by the state legislature in 1977, the Wisconsin law explicitly prohibits discrimination on the basis of arrest or conviction records by employers, labor organizations, employment agencies, licensing agencies, and other persons.[69] Prohibited discriminatory acts include refusals to employ, promote, admit to membership or license, as well as terminations from employment or membership.[70] These prohibitions relative to promotion and termination distinguish Wisconsin's law from New York's, which prohibits only employment or licensing denial.

Of course, the bar to discrimination was passed with an important class of exceptions. An employer may consider the arrest or conviction record of an applicant or employee if the circumstances of the arrest or conviction substantially relate to the circumstances of the particular job in question.[71] The definition of "substantial relation" was left to the agency responsible for law enforcement: then the Industrial Commission, now, its successor, the Department of Industry, Labor, and Human Relations (DILHR).

The state statute also specified that in arrest situations, employers were allowed to suspend the employee involved pending the outcome of the charge. Discharge upon conviction, of course, could be justified only if there were a substantial relationship between it and the employment in question.

### B. Enforcement

Claims of discrimination are filed with DILHR , where a hearings examiner is authorized to investigate, make findings, and order relief.[72] These findings are subject to review by the Labor and Industry Review Commission (LIRC), while Commission decisions are subject to judicial review.[73]

Where unlawful discrimination is found, DILHR may "order such action" by the discriminating party "as will effectuate the purposes of [the Act], with or without back pay."[74] Back pay liability, however, may not accrue from a date earlier than two years prior to the filing of the complaint, and is offset by interim earnings or earnings that could have been reasonably

27

expected.[75]  (This limitation and the lack of ability to order compensatory damages, make the Department's enforcement power less than that of its New York counterpart.)

## C.  Interpretation of "Substantial Relationship"

The substantial relationship needed between an ex-offender's criminal history and employment to justify discrimination was given specific meaning by a series of decisions by the Labor Industrial Relations Commission (LIRC) from 1981 to 1985.[76]  The result was a factor-weighing approach similar to New York's 8 Factor Test. Prior to 1987, a hiring or firing employer had to consider factors such as length of time since conviction, number and seriousness of offenses, high moral requirements of certain jobs, evidence of rehabilitation, and mitigating circumstances of an offense. Most importantly, the burden was on the employer to engage in a somewhat detailed factual investigation relative to the particular employee's circumstances. This precluded employers from not only engaging in broad based hiring prohibitions, but from simply labeling certain past criminal offenses as incompatible with current employment, without further investigation of individual circumstances.

All of this changed in 1987 when the Wisconsin Supreme Court, in *County of Milwaukee v. Labor and Industry Review Commission,* repudiated the agency's factor-weighing test.[77]  The case involved the firing of a crisis intervention specialist because of his conviction for homicide by reckless conduct and 12 misdemeanor counts of patient neglect arising out of his *prior employment* as a nursing home administrator. The employee's exemplary performance as a crisis specialist was used by the administrative enforcement agency to determine that the past offenses committed bore no relation to his then current position, and that the firing was discriminatory. The state Supreme Court reversed, finding that the employee's job performance was irrelevant and that the only factors to be weighed under the statue involved the opportunity for criminal behavior afforded by the job, the convicted person's character traits (as determined by past offenses), and the reaction to responsibility at the job that he or she would have based upon such traits. In *County of Milwaukee*, the court noted that 12 misdemeanors showed a pattern of neglect that was the employee's character trait. This trait, the court determined, was not consistent with the job of aiding and advising mentally ill patients, regardless of his demonstrated ability to perform such work. The court thus relieved employers of considering the circumstances of an employee's criminal history and rehabilitation, and allowed them to make judgements of employee character and employability solely on the basis of the crime committed.

A review of reported Court and LIRC cases since the time of *County of Milwaukee* indicate that substantial relation is broadly construed, and, as the following agency and court decisions indicate,  practically any crime can be found to have a substantial relationship to any employment:

••    Bail jumping and communicating with jurors substantially related to certified public accountant;[78]

••    Operating a Tavern beyond lawful closing hours and obstructing a police officer

28

substantially related to truck driver in interstate commerce (because offenses indicated an inclination to disregard safety-related regulations);[79]

•• Forgery and being a party to a crime substantially related to direct mail specialist;[80]

•• Illegal possession of firearm substantially related to assembly line worker in pizza distribution company (because employee made repeated threats of physical violence against co-workers in pizza company);[81]

•• Forgery and burglary substantially related to insurance agent (because of access to checks and to forms that could be forged);[82]

•• Arson substantially related to Food Service Worker job at juvenile offender institution (because arson indicates disregard for welfare of others);[83]

•• Delivery of Drugs substantially related to machine operator at Paper Mill (because free, unsupervised time at job site would provide temptation for person with demonstrated inclination to sell drugs);[84]

•• Welfare Fraud substantially related to automotive department manager (because of access to cash registers and inventory);[85]

•• Shoplifting related to customer representative for power company (because job involved visits to residential and commercial customer sites when customers were not present, presenting temptations similar to those present in shoplifting);[86]

•• Shoplifting substantially related to group insurance claims technician (because of authority on job to release up to $15,000 in payment of medical claims without supervisory approval).[87]

### D. Attempts to Narrow Scope of Statute

Despite the clear employer bias in the law as enforced, a number of high profile cases involving ex-offenders have spurred lawmakers in Wisconsin to attempt to limit state statutory protections for ex-offenders even beyond the limitation of *County of Milwaukee.*

Gerald Turner killed a nine year old girl who came to his house "trick or treating" on Halloween in 1973. After serving 21 years of a 38 year sentence, Turner was released to a halfway house under tight supervision and applied for jobs with 100 companies and agencies, all of which turned him down. When a Waste Management firm offer him a job to sort recyclables and then withdrew the offer, Turner filed a complaint with the LIRC in 1998 seeking lost wages of $7,100. The employer settled the case for under $4,000.[88]

In 1992, Mark Moore was convicted of throwing hot grease on the 20 month old daughter

29

of his girlfriend (the original target of the grease) during a domestic dispute. After serving time, he applied in 1996 for a job as a boiler attendant trainee in the Milwaukee Public Schools system, and was rejected because of the conviction. Moore filed a complaint with the LIRC, which found that the conviction was not substantially related to the boiler job.[89] The LIRC's decision recently was upheld by a state appeals court.[90]

Each case has prompted legislative attempts to carve out a larger exceptions for employers than currently exists. One bill, introduced the last two legislative sessions, would allow Schools to discriminate against felons, while another bill would extend this felony-based discrimination to all employers. Each bill has passed the Wisconsin House of Representatives and currently await Senate consideration.[91]  In 1997, the General Assembly prohibited health-care providers (nursing homes, hospitals, day care agencies, and group homes) from hiring persons convicted of certain crimes, unless they proved rehabilitation.[92]

### E.  Objective Evaluation

As Wisconsin requires ex-offenders to seek redress for unlawful discrimination solely through the administrative complaint process, state agency data reflect the entire universe of ex-offender claims in Wisconsin. As with New York, the complaints are few.

In FY 2001, the Wisconsin Equal Rights Division reported that 212 complaints were received alleging discrimination based on conviction records. An additional 130 complaints were filed alleging discrimination based on arrest records. These latter complaints involved either employment suspensions or terminations because state law prohibits the use of arrest records in hiring (but allows employers to suspend employees who are arrested). As with New York, the number of criminal records related complaints paled in comparison to the number of employment related discrimination complaints filed. The Division received 3,247 complaints of employment discrimination in FY 2001, alleging a total  4,673 bases for discrimination. The prior year the agency received roughly the same number of total complaints (3,235), of which 188 were conviction related and 107 related to arrest records. In short, Wisconsin averages 200 conviction and 118 arrest related complaints annually.

The complaints also pale in comparison

| Employment Discrimination Complaints By Subject Matter FY 2001 | |
|---|---|
| Race | 893 |
| Sex | 891 |
| Disability | 871 |
| Age | 535 |
| Conviction Record | 212 |
| Arrest Record | 130 |
| National Origin | 122 |
| Religion | 54 |
| Sexual Orientation | 54 |
| Marital Status | 35 |
| Source: Wisconsin Equal Rights Division | |

30

to the numbers of potential claimants. Wisconsin paroled 5,918 inmates from its correctional facilities in 2000, and placed an additional 25,291 on probation.

As with New York, the few complaints that were filed and disposed of appear to favor the employers. Of the 212 conviction related complaints filed, 73% were either dismissed or found to have no "probable cause." Of the 130 arrest record complaints filed, 66% were either dismissed or found to have no probable cause.

When queried about the impact of the *County of Milwaukee* on arrest and conviction complaints, staff at the Wisconsin Equal Rights Division reported little impact. The number of criminal history related complaints received by the Division has remained relatively constant for the last fifteen years.

| Disposition of Arrest and Conviction Complaints FY 2001 | | |
|---|---|---|
|  | **Arrest** | **Conviction** |
| Probable Cause | 34 | 35 |
| No Probable Cause | 54 | 102 |
| Settled | 11 | 23 |
| Dismissed | 32 | 52 |
| **TOTAL** | **130** | **212** |

Source: Wisconsin Equal Rights Division

## F. Subjective Evaluation

As noted by Jeffrey Meyers, who studied the Wisconsin scheme in 1988, a New York style statute that contains specific factors to be considered in determining the meaning of "substantial relationship" has three advantages over the general language of the Wisconsin law:

> First, specific factors tell employers what facts must be considered when determining whether they may discriminate. Second, specific factors provide parameters within which the exercise of administrative rulings may occur. Third, they provide a standard against which a reviewing court may judge the administrative exercise of discretion.[93]

Not surprisingly, the agency charged with the administrative enforcement of Wisconsin's general language statute crafted a de facto specific factors test, through a series of administrative decisions. While the move may have been prudent and effective for ex-offenders, the state supreme court's obliteration of it was a stark reminder that the statute itself had not been amended. Absent amendment, the statute always ran the risk of being interpreted in a more conservative manner by the courts. A judicial interpretation is, at times, the inevitable end product of legislative compromise, and, no doubt, the general language statute was the best rehabilitation advocates could get passed by the legislature at the time. With the stage set by the

31

legislature, protection of ex-offenders became a question of whether the economic and political forces that governed the state supreme court would trump the forces at work in the agency. They did, and rendered Wisconsin's statute meaningless.

# V. PENNSYLVANIA

Like New York and Wisconsin, Pennsylvania in the 1970s enacted a state law designed to limit the employment discrimination faced by ex-offenders. Unlike New York and Wisconsin, the state provided no enforcement mechanism, nor did it give aggrieved employment applicants an explicit right to sue under the provision. Needless to say, the law remains unknown to most employers and applicants for employment. As with Wisconsin, a number of high profile cases involving employees with past criminal histories has prompted state legislative action to limit even these minimal legal protections to ex-offenders.

## A.  The Statute

Buried within the list of Crimes and Offenses in Pennsylvania law is one relating to the use of criminal history records for employment: "Felony and Misdemeanor convictions may be considered by the employer only to the extent to which they relate to the applicant's suitability for employment in the position for which he has applied."[94]  In short, the state employs a "simple" relationship test: conviction based discrimination can occur if the conviction bears any relationship to the job sought.

> **State Anti-Discrimination Standards**
> **New York:** Employer may discriminate if "direct relationship" between criminal history and employment.  (Direct relationship determined through 8 Factor Test.)
> **Wisconsin:** Employer may discriminate if "substantial relationship" between criminal history and employment.
> **Hawaii:** Employer may discriminate if conviction bears a "rational relationship" to job duties.
> **Pennsylvania:** Employer may discriminate if criminal history "relates" to employment.

Additionally, the statute requires the employer to notify the applicant in writing if the decision not to hire is based in whole or in part on criminal history.[95]

## B.  Enforcement

While Pennsylvania's "simple" relationship statute appears to be a modified, lower standard version of anti-discrimination protections in New York and Wisconsin, the legislature's failure to provide a clear enforcement mechanism suggests it was never intended to address discrimination. Unlike the administrative options for enforcement available in New York and Wisconsin, Pennsylvania provides only one means to enforce its law– through litigation. Yet, without a clearly delineated remedy for violation of the statute, such lawsuits must be linked to other theories of law (i.e. violation of contract or negligence). These other theories are more available in cases where an employee is discharged for a criminal background, than where an applicant for employment is rejected.

Additionally, the statute does not provide for the award of "attorneys fees" for a successful litigant. Without this means to recover their own costs of litigation, private attorneys are reluctant to undertake these cases. According to Sharon Dietrich, an attorney  with

33

Philadelphia Community Legal Services, the Pennsylvania criminal records law is a "right without a remedy."[96]

## C. Backlash

There are 2.8 million Pennsylvanians who are 60 years of age or older, putting the state second only to Florida in its relative percentage of elderly residents. This perceived voting constituency, combined with a few high profile cases of abuse of the elderly at the hands of care givers with prior criminal histories, prompted a legislative determination in 1996 that persons with criminal backgrounds should not be trusted to care for the elderly, mentally ill, or retarded, whether in nursing homes, personal care homes, or private residences.

As originally passed in 1996, the law established two categories of past criminal convictions: those crimes that automatically disqualified an individual from obtaining or continuing employment in a health care facility irrespective of when the conviction occurred, and those crimes that disqualified an individual only if the conviction occurred within the last ten years.[97] Specifically, any individual convicted of certain violent or sexual crimes– including, but not limited to, murder, rape, and sexual assault– was automatically disqualified from holding any employment position at a covered health care facility regardless of when the criminal conduct took place. In contrast, those convicted of "lesser" enumerated felonies or misdemeanors– including assault, low-level drug crimes, and certain theft felonies and misdemeanors– were disqualified from working at a health care facility only if the conviction took place within the last ten years.

> **Crimes That Forever Disqualify Individuals for Employment in Pennsylvania Residential Health Care Facilities**
> Homicide, Aggravated Assault, Kidnapping, Unlawful Restraint, Rape, Sexual Assault, Aggravated Indecent Assault, Indecent Assault, Indecent Exposure, Arson and Related Offenses, Burglary, Robbery, Theft and related offenses (or two or more misdemeanors), Forgery, securing documents by Deception, Incest, Concealing Death of a Child, Endangering Welfare of Children, Dealing in Infant Children, Intimidation of Witnesses or Victims, Retaliation against witness or victim, Prostitution and related offenses, corruption of minors, Sexual Abuse of Children, Obscene and Other Sexual Material and Performances, and any Drug Related Felony.

In 1997, however, the state legislature went a step further, removing the ten year limitation and rewriting the list of disqualifying felonies and misdemeanors.[98] Currently, any individual who has ever been convicted of any one of the enumerated crimes– including offenses such as prostitution, forgery, and theft misdemeanors– *at any time in his or her life* is automatically disqualified from holding *any* employment position at any covered health care facility. Unlike the criminal records statute enacted in the 1970s, penalties for violations of these laws are specifically set forth in statute and involve both fines for the health care facility and incarceration for the facility administrator who breaks the law. The lack of temporal limitations on convictions, the blanket prohibition on

34

employment (which extends even to a dishwasher without access to patients), and the lack of any procedural means for assessing individuals on a case-by-case basis, have formed the grounds for a legal challenge to the law, filed in August, 2000 in Pennsylvania Commonwealth Court.[99] The plaintiffs in the case include a 48 year old former administrator of assisted living facilities from Pittsburgh, who was convicted 30 years ago for marijuana possession at age 19 (for which he served no jail time). Unable to find work in Pennsylvania because of the law, he moved to Michigan. The plaintiffs also include a non-profit agency that sponsors over 130 human services programs. The lawsuit is currently pending.

### D.  Objective and Subjective Analysis

Lawsuits relative to Pennsylvania's anti-discrimination statute are rare, and ex-offenders daily experience discrimination based on their criminal histories. According to Dietrich, one of the few attorneys in Pennsylvania who use the anti-discrimination statute, the law had gone unnoticed and unused even by employment attorneys and advocates until recently, and has been the grounds for perhaps a handful of cases in the last 13 years. Employers, according to Dietrich, have no knowledge of its existence. Yet, Dietrich usually does not advise rejected applicants to file lawsuits, but rather directs those who are minorities to the Equal Employment Opportunities Commission (EEOC), to file race-based federal Title VII complaints of discrimination.[100] Absent a remedy and enforcement mechanism, the Pennsylvania statute looks more like a legislative resolution: an expression of legislative intent without the will to back it up.

---

**If Title VII Outlaws Race-Based Discrimination Against Ex-Offenders, Why Does It Occur?**

Title VII of the Civil Rights Act, as noted in the discussion of the history of New York's statute (p.16) was interpreted by the EEOC in the mid 1970s to outlaw broad-based hiring prohibitions against ex-offenders and required employers to show a "business justification" for the practice. This justification could be shown by the employer only after considering a number of factors (age at time of the offense, nature of the offense, relationship to nature of job) deemed relative to what the courts called an "overriding legitimate business purpose." In an attempt to remedy a series of questionable U.S. Supreme Court interpretations of Title VII, Congress enacted the Civil Rights Act of 1991, which repudiated the Court but failed to provide clear directions for litigating the types of claims ex-offenders could bring (known as claims of "adverse impact," where discriminatory impact, not intent, is the relevant inquiry). The amendments require employers using a selection standard having an adverse impact on minorities to prove that the "challenged practice is job related...and consistent with business necessity." Prior to the amendments, the challenged practice needed to be *required* by business necessity, not simply *consistent* with it. What this means for race-based ex-offender claims under Title VII is an open question. HPRP has encountered at least one major Baltimore employer who contends that the 1991 Amendments have all but eliminated ex-offender Title VII claims based on adverse impact. Other employee advocates disagree. The Baltimore EEOC office has declined to pursue the handful of ex-offender claims referred to it by HPRP to date. With the state of law in flux and the enforcement agency reluctant to pursue claims, Title VII has been reduced to a questionable tool for minority ex-offenders.

---

## VI. MASSACHUSETTS

Massachusetts represents a different approach to balancing the twin concerns of ex-offender recidivism and rehabilitation. Rather than enacting a general prohibition against discrimination and asking employers to show a nexus between the occupation and the criminal history at issue, the state has opted simply to the criminal history information available to employers. As concerns for employer liability and pubic safety have increased over the years, however, the state modestly has expanded access to criminal histories. These public safety concerns, fueled by media attention, led the state to adopt in 1996 a policy prohibiting the employment of persons with certain convictions in the human services arena. The bar, which applied to all state employees and human service organizations funded by the state, was partially struck down by a Massachusetts court in August, 2001.

## A. **The Statutes**

All state criminal record information released to the public in Massachusetts must go through the Massachusetts Criminal History Systems Board (CHSB), which is responsible for maintaining and controlling the state's automated Criminal Offender Record Information System (CORI).[101] Employers can obtain records from the last two years on any offender through a "public access record check," or can apply to the CHSB for "special certification" to receive the offender's complete record. If the Board determines that the need for criminal record information outweighs the offender's privacy and security interests, the certification will be granted.[102]

Additionally, employers may apply to the Board for a "general grant" of access, which, if authorized by the CHSB, eliminates the need for Board approval for each individual criminal history sought.[103] The CHSB has 18 members, most of whom are public safety officials, and meets monthly to consider individual requests for access, special certifications, and general grant applications.[104]

Also, Massachusetts anti-discrimination laws prohibit employers from asking job applicants any questions relative to:
- arrests that did not result in convictions;
- *any* conviction of a misdemeanor where five or more years have passed (from the date of conviction or completion of incarceration) provided, however, that the offender has not incurred a subsequent conviction within those five years; and
- a *first conviction* for drunkenness, simple assault, disturbing the peace (and minor traffic violations, including speeding).

While an aggrieved applicant can seek enforcement of the anti-discrimination law through the Massachusetts Commission Against Discrimination (MCAD), the protection is a hollow right for the applicant because it does not prohibit the employer from seeking this information through the CHSB. The anti-discrimination protection exists, according to the state's highest court, "merely to protect employees from requests from their employers and not to proscribe employers from seeking such information elsewhere."[105] Not surprisingly, the MCAD

36

reports that no complaints have been filed in the last two years under the anti-discrimination law.

## B. The Expansion of CORI Access

Enacted in 1972 to protect the privacy rights of ex-offenders and assist in their rehabilitation, the state's CORI statute limited access to criminal histories to only those agencies involved in the criminal justice system.[106] In 1978, access was expanded to the public, but only if the CHSB determined that such disclosure outweighed individual privacy rights.[107]

The balance between the public's right to know and ex-offender privacy tipped toward the public in 1988, when the case of Willie Horton was used in the Presidential campaign to portray candidate Gov. Michael Dukakis as soft on crime. While serving a life sentence, Horton was released on furlough, fled Massachusetts and terrorized a Maryland couple in their home. Seeking an explanation for the furlough, media, legislators and citizens asked state correction officials for records, but were stymied by the CORI statute. Amidst intense criticism and threatened litigation by *The Boston Globe*, Dukakis submitted legislation to amend CORI and expand public access.[108]

Passed two years later in 1990, the amendments allowed the public to sidestep the CHSB and gain access, as a matter of right, to the criminal records of certain "active criminals" (defined as anyone who was currently in prison or on parole or probation). Access remains open for two years after the offender completes his or her sentence, if convicted of a felony, or one year if convicted of a misdemeanor. (At the time of passage, 422 private businesses and 1,025 government agencies already had obtained access to the histories of any ex-offender through the CHSB process.[109])

After a 1992 federal court decision expanded public access further, the legislature enacted a series of laws providing CORI access to entities that maintained foster homes or who received any type of government funding and where employees or volunteers interacted with the elderly or disabled.[110] When the *Globe* revealed that despite these background checks, the state had approved ex-violent offenders, and former drug and child abusers as foster parents, Gov. William Weld promulgated a far ranging state policy that barred most ex-offenders from work in the human service arena.

Issued in May, 1996, the policy identified a nearly exhaustive list of felony and misdemeanor crimes, and barred ex-offenders convicted of these crimes from state employment *or from employment with private agencies receiving state funds.* A lifetime bar to employment was created for violent offenders(and for crimes of sexual assault and drug tafficking), while five and ten year bars were erected for others, depending on the nature of the offense.[111] Despite credible evidence that many ex-offenders were effective counselors for drug addicts and homeless people, the Weld Administration refused to yield, and the policy was challenged in court.[112]

In June 2001, shortly after Weld left office, then acting Gov. Jane Swift modified the five

37

and ten year bars by allowing the bars to be overcome with "certification" from parole officials, forensic psychiatrists, or mental health professionals that ex-offenders posed "no unacceptable risk." Permanent bars to employment remained for violent offenders. In August, 2001, the state's Supreme Judicial Court upheld the temporary bars, but struck down the lifetime prohibition on constitutional grounds.[113]

## C.  Objective and Subjective Evaluation

Governor Weld's sweeping employment bar has been the focus over the last few years of most Massachusetts organizations that work with ex-offenders. Ex-offenders and their sympathizers mobilized to attend public hearings, lobby state agencies, and engage in protests (one of which, in February, 2001, included two City Councilman who join two dozen others in a sit-in at the Department of Public Health).[114] The campaign has provided both the new Swift administration and the Supreme Judicial Court with public support for modifying the employment prohibitions.

Weld's policy was harsh and targeted a key sector of employment for ex-offenders: non-profit organizations. While it could be argued that this move against ex-offenders was the result of an inevitable collision between a few high profile cases of recidivism and the state's policy of limiting information on ex-offenders, there is little evidence to support it. The outcry against ex-offenders as Foster Care providers in Massachusetts was not the result of agencies having limited knowledge of the criminal histories of their providers (the state authorized CORI access in 1992), but of agencies knowingly utilizing ex-offenders with violent histories. Additionally, this call to bar ex-offenders from human service work also was echoed, with different policy results, in both Pennsylvania and Wisconsin, states where access to criminal histories is unlimited.

The understandable and deserved focus on the Weld policy by ex-offenders and their sympathizers in Massachusetts overshadows the fact that the state's bulwark against ex-offender discrimination–the limitation of CORI access–remains intact despite some pre-Weld access expansion. While the authors of a report on CORI from the Northeastern University School of Law appear outraged that over 7,500 businesses and agencies have secured unlimited access to criminal records via the CHSB (a five fold increase since 1990), there are at least 149,559 non-public employers in the state.[115] In fact, business growth in Massachusetts in the 1990s outpaced the growth in employers who secured unlimited access to criminal records during roughly the same period.[116] This is a far cry from states like Maryland where all employers, an estimated 117,830, have unlimited access to criminal histories of ex-offenders.[117]

Certainly, the employment of ex-offenders in the human service arena will continue to be difficult in Massachusetts because of Weld's policy, despite Gov. Swift's modifications of Weld's five and ten year employment bars. Yet, in other business sectors, the state's policy of limiting access to criminal histories appears to be intact and is, perhaps, the most effective public policy to assure that ex-offenders are free from hiring discrimination. Whether such a policy could be successfully introduced in a state like Maryland with a history of unlimited access to

38

criminal histories is difficult to determine.

## VII. OTHER STATES

The following states have enacted statutes relative to criminal records and employment, but were not examined in depth by HPRP or evaluated.

### A. Hawaii: Discrimination Outlawed Unless Rationally Related to Job

Hawaii uses elements of both Wisconsin and Massachusetts, combining a general prohibition against discrimination on the basis of criminal records with a reporting limitation–employers may examine conviction records only for the last ten years. As with the general discrimination prohibitions in Wisconsin and Pennsylvania, Hawaii allows employers to reject ex-offenders if their conviction records bear a "rational relationship to the duties and responsibilities of the position."[118] The law can be enforced, like New York and Wisconsin, through administrative complaints to the state's Civil Rights Commission. The Commission can order hiring, or reinstatement with back pay.[119] Arrests cannot be considered.

In FY 1999, the Commission received only 14 complaints relative to criminal records out of a total of 537 employment discrimination complaints. An official with the Commission estimates that few, if any, of the complaints prevailed, because the "rational relationship" standard is easy for employers to meet.[120]

### B. Minnesota: Discrimination in Public Employment Outlawed Unless Directly Related to Job

Minnesota limits its anti-discrimination statute to public employment, allowing denial of employment only where a *conviction* can be shown to directly relate to the position sought.[121] Ex-offenders, however, can overcome the direct relationship showing by a showing that they have successfully completed parole or probation and at least one year has lapsed without subsequent conviction.[122] Arrest records cannot be considered by public employers.[123] Enforcement of the law is done through the administrative complaint process available to all public employees or those aggrieved by public agency action.[124] The laws do not apply to peace officers, law enforcement, or fire protection agencies.[125]

### C. Washington: Discrimination in Public Employment Outlawed Unless Directly Related to Employment; Certain Convictions Can Be Vacated

Like Minnesota, Washington limits its anti-discrimination provisions relative to ex-offenders to public employment. Discrimination is allowed by public employers, however, if the *conviction* "directly relates" to the position or license sought, and the time that has elapsed since the conviction is less than ten years.[126]

39

Washington does provide a tool for all ex-offenders, however. Convicted defendants who have completed their sentences can apply to the sentencing court to have their convictions "vacated" and thus eliminated from their criminal history.[127] This option is not available for violent offenses or certain crimes "against persons." Felonies require a waiting period of five to ten years, depending on the felony.[128]

## D. Colorado: Certain Convictions Can Be Sealed

Colorado gives defendants the right to petition a sentencing court to "seal" a conviction record, thereby making it off limits to employers, if the court finds that "unwarranted advderse consequences to the petitioner outweigh the public interest in retaining the records."[129]  Certain convictions, such as those involving sexual behavior, cannot be sealed.[130]

## E. New Jersey and Louisiana: Occupational Licensing Protection

New Jersey prohibits licensing authorities from disqualifying an ex-offender unless it can be shown that the *conviction* "relates adversely to the occupation, trade, vocation, profession or business for which the license is sought."[131] In determining whether the conviction relates adversely, the authority is required to engage in a New York style "factor test," examining the nature and seriousness of the conviction, the defendant's age at the time of conviction, date of the crime, evidence of rehabilitation, etc. A license denial or termination must set forth this factor evaluation in writing.[132]

Louisiana limits its licensing protections to felonies only, allowing disqualifications or denials where a *conviction* "directly relates" to the trade or occupation at issue.[133]

## VIII. CONCLUSION AND RECOMMENDATIONS

It is clear that no state has successfully balanced the twin policy concerns relative to ex-offenders: the risk of recidivism and the hope for rehabilitation. New York's ambitious combination of  Certificates and the 8 Factor test is easily sidestepped, Wisconsin's general

40

prohibition against discrimination has been rendered meaningless by its supreme court, and Pennsylvania's law has no remedy or means of enforcement. Complaints brought by ex-offenders pursuant to these laws are rare for the most part, in sharp contrast to the complaints of discrimination voiced by those who work with ex-offenders in each state. While Massachusetts' decision not to control the behavior of employers but rather the information provided to them is perhaps the surest way to prohibit discrimination, the policy has its risks.

These pitfalls are hardly an excuse for legislative silence in Maryland. As indicated earlier, at least 26 Maryland laws currently prohibit or discourage the employment of ex-offenders. In contrast, no Maryland law explicitly acknowledges the public interest in employing ex-offenders and requires employers to consider it. In a state that releases roughly 8,000 persons annually from correctional facilities and places another 43,000 each year on probation, such an acknowledgment is long overdue.

The policy recommendations that follow attempt to balance the twin policy concerns relative to ex-offenders in Maryland. They are offered as a means to achieve such a balance without unduly burdening employers or the public sector. While the adoption of all would be the surest way to level the playing field for ex-offenders in Maryland, passage of any single one would be a step toward righting the imbalance that currently exists.

## 1. Prohibit the Reporting and Consideration of Non-Convictions

If the presumption of innocence is to have more than simply theoretical value, employers must not be allowed to consider cases where that presumption has not been overcome. Cases resolved via dismissal, stet, nolle prosequi, or a not guilty finding should not be reported to employers by Consumer Reporting Agencies, the courts, or CJIS. The same should be true of a Probation Before Judgement (PBJ) disposition, though under a different rationale. While guilt may be involved in a PBJ, the statute grants to a Judge the discretion to determine that circumstances warrant no further punishment to the defendant beyond the terms of probation. Upon successful completion of those terms, the statute states the defendant is to experience no "disqualification or disability" normally associated with a conviction. The discretion granted a judge via a PBJ should be respected, and not undermined by savvy employers. Prohibiting access to such dispositions would ensure this respect. In Maryland, employers should consider only those charges where a person was found guilty–convictions– and should not be allowed to speculate about charges already disposed of by the Courts.

## 2. Prohibit the Consideration of Any Conviction Older Than Seven Years and Misdemeanor Convictions Older Than Five Years

It is far easier, as Massachusetts recognized, to eliminate the incentive to discriminate against ex-offenders than it is to regulate the discrimination. In limiting access to criminal record information, Massachusetts has obviated the need for any anti-discrimination law and its enforcement. In Maryland, however, employers have had virtually unfettered access for years to

41

applicant criminal histories. Imposing a Massachusetts-style gatekeeper through which all requests for access are processed would be a radical change for business and create a new layer of state bureaucracy.

Yet, Massachusetts also employs a statute that limits employer inquiries about certain convictions, depending on the time of conviction and its nature.[134] For example, an employer cannot inquire about a misdemeanor conviction that is older than five years, unless the person has been convicted of any offense since. Likewise, inquiries cannot be made about first time convictions for drunkenness, simple assault, disturbing the peace, etc.

While the Massachusetts law has been construed to allow employers to obtain this information from third parties (i.e. consumer reporting agencies), Maryland could enact a similar law and expand its application to third party sources as well.[135]

Restricting employer inquiries also is warranted given the current state of law relative to consumer reporting agencies. As noted earlier, Maryland law, in existence since 1976, prohibits those agencies from reporting to employers convictions that are older than seven years, yet many agencies are using 1998 federal law changes to flout the state law. Aggressive enforcement of the state restriction by the Department of Labor, Licensing, and Regulation is certainly warranted, as well as litigation relative to past violations. Yet, federal law currently prohibits states from enacting *new* limitations on the information contained in such reports. Thus, any limitation in this area must be placed upon *requests by the employer made to the applicant, any credit reporting agency, or any other source of criminal records.*

Maryland should prohibit employers from considering *any conviction* that is older than seven years, a limitation consistent with the consumer reporting statute. Additionally, the state should adopt the Massachusetts approach of limiting employer inquiries about misdemeanor convictions that are older than five years. Certain misdemeanors could be made exempt from this limitation, and such inquiry protection could be made to expire upon further convictions.

### 3. Require Employers To Give Written Notice of Denials of Employment To Ex-Offenders That Provide the Reasons for the Denial

Currently, employers in Maryland are under no obligation to provide a rejected employment applicant with any explanation of the rejection, either verbal or written. As indicated in the discussion about Consumer Reporting Agencies ( see pp. 11-13), employers who reject ex-offenders because of criminal histories often sidestep discussions with rejected applicants by directing them to the Consumer Reporting Agency who simply compiled the history. Rejected applicants are given no indication about employer policies or whether their own efforts at rehabilitation were considered.

Equity alone requires a change. Rejected ex-offenders who are notified of the nature of employer fears may be able to direct or re-direct their rehabilitation efforts accordingly.

42

Employers who utilize broad-based hiring prohibitions against ex-offenders should be clearly identified, to allow informed decision-making by job counselors, developers, and public policy makers.[136]

## 4. Outlaw Broad Based Hiring Prohibitions and Require Employers To Consider Certain Factors When Evaluating Ex-Offenders

A broad based hiring prohibition, where applicants are rejected for employment because of *any* criminal offense, regardless of the time or nature of the charge, is simply not fair, reasonable, or consistent with the dual policy aims relative to rehabilitation and recidivism. The wholesale exclusion of groups of people from certain jobs based on assumptions about the nature of such people, should be strictly a matter of public policy–crafted after a public and deliberative process. This process to date in Maryland has produced a small number of statutorily based hiring prohibitions in health care and education.

A New York style statute, that requires employers and licensing authorities to consider factors such as the age of the person at the time of the offense, the time that has elapsed since the offense, the bearing the offense has on fitness to perform on the job, and information relative to rehabilitation, would be the first step to eliminate broad based hiring prohibitions and require employers to re-think their assumptions about certain ex-offenders. As the New York and Wisconsin experiences

| Certificates Of Rehabilitation? |
| --- |
| In theory New York's certificates of rehabilitation grant general "presumptions" of rehabilitation that put certificate holders on the same legal footing as non-offenders. In practice, however, certificates are treated more like letters of recommendation,. Their true value appears to be in overcoming statutory bars to employment, though employers can still deny employment on other grounds. Maryland has only six statutes that bar employment of certain ex-offenders (see pp.3-4), while New York has dozens. At this point, creation of a certificate process simply to address those bars seems unwarranted, though a certificate that could be used to remove other statutory civil disabilities (i.e., voting, housing, or welfare) would be useful. |

indicate, however, a law alone will not change behavior. The law must be accompanied by an easy-to-use and effective enforcement mechanism.

## 5. Provide Both an Administrative and Judicial Forum for Enforcement of the Factor Test That Will Be Utilized By Aggrieved Claimants

There is little question that in New York, Wisconsin, and Pennsylvania, ex-offenders believe they are the victims of discrimination that is unlawful under their respective state laws. Yet, such offenders appear reluctant to file complaints. In Pennsylvania, where no enforcement mechanism exists, this is understandable. In Wisconsin and New York, which have administrative enforcement agencies that in theory are easier to access than the courts, this is mystifying. While Maryland should not encourage the filing of frivolous complaints, it is clear

43

that the simple creation of an administrative agency enforcement mechanism [i.e. through the Maryland Commission on Human Relations (MCHR)] will not result in its use by ex-offenders. Ex-offenders should be notified in writing of the mechanism, and be provided the means by which to file an administrative complaint whenever they are denied employment. This can be done through existing channels. Currently, Consumer Reporting Agencies are required to notify employment applicants when they provide "public record" information such as criminal histories to third parties (i.e., employers). These notices could include information about any new Maryland public policies in this area (i.e., requiring employers to consider "factors" or to provide written notice of rejection, etc.) and include MCHR complaint forms as well.

Additionally, as with New York, a litigation option should be available to aggrieved applicants. And as with New York, the choice of administrative or litigative enforcement should be exclusive, thereby relieving employer of the burden of defending themselves at MCHR and in court. Unlike New York, however, attorneys fees should be provided in statute to prevailing parties in such suits. Absent such a fee provision, the litigation option is illusory and the administrative enforcement process may be overburdened.

### 6. Limit Employer Liability Under the Negligent Hiring Doctrine

While there are only a handful of Maryland statutes that prohibit the hiring of certain ex-offenders, there are dozens of others that require background checks and leave it to the employer to determine whether the applicant is appropriate. The Negligent Hiring doctrine, which makes employers liable for foreseeable harm caused by their employees, has made many employers nervous about hiring in these situations when *any* criminal history is present, regardless of the nature and time of the offense. This is understandable.

Also understandable is the burden any employer would bear under a new Maryland "Factor Test" statute, with accompanying notice provisions. The increased "cost" to employers under such a scheme is real, and should be recognized as one incurred in the public interest.

Placing statutory limitations on liability under the Negligent Hiring doctrine can facilitate the public interest in hiring ex-offenders, while addressing cost concerns of employers. Small employers could be exempted from liability under the doctrine and damage award limits could be set. Such liability and coverage limits already are present in other areas of employment law. Title VII of the Civil Rights Act of 1964 does not apply to businesses with fewer than fifteen employees, and other civil rights

> **State Supported Fidelity Bonds For Ex-Offenders**
> Maryland is one of 19 states who have not provided state funds for the purchase of individual fidelity bonds under the Federal Bonding Program. While the bonds cover only acts of employee dishonesty (outside the scope of the Negligent Hiring Doctrine) and historically have been underutilized, they are relatively inexpensive (100 bonds can be purchased at a cost of $84 per bond) and have an excellent track record. At the very least, last session's legislative attempt to create a state fidelity bond pilot program (SB 809) should be attempted again and passed.

statutes (i.e., 42 USC §1981a) limit the available compensatory and punitive damages based on the employer's size. Additionally, liability limits for a defendant's own negligence are applied

44

in various areas of the law, such as environmental pollution, aircraft disasters, medical malpractice, and negligent bailment[137].

Employers should not face liability or exorbitant damage awards if there has been a good faith compliance with any Maryland law that supports the hiring of ex-offenders.

### 7. Amend the Expungement Statute To Allow Expungement of All Non-Convictions, Regardless of Subsequent Behavior by the Defendant

Only non-convictions can be expunged in Maryland. An expungement occurs only upon application to court by the defendant

> **Other Civil Disabilities: Voting, Housing, Welfare**
>
> The disqualifications to voting and public assistance created by criminal histories (see pp. 13-14) simply can be removed by state statute. Efforts to do this are either underway or have been attempted recently. The subsidized housing realm, however, poses a different problem. There, federal law requires law enforcement agencies to provide Housing Authorities with conviction information for purposes of applicant screening, yet does not require Housing Authorities to request it. State action in this area could place the Authorities under many of same laws recommended for the labor market (i.e. limit the reporting of convictions, eliminate broad based prohibitions, require consideration of "factors" when evaluating ex-offender applicants). Extension of such laws to private landlords would evince a uniform and consistent public policy.

after three years have elapsed from the time of the charge or its resolution. The expungement right is extinguished, however, if the defendant is subsequently convicted of a crime– regardless of the time that has transpired between the non-conviction and conviction. Thus for example, a defendant who does not exercise his or her right to expunge a non-conviction that occurred in 1980, will lose the right to expunge the charge if he or she is convicted of *any crime* in 1998.

The failure of defendants to timely apply for expungement of non-convictions is not simply a matter of individual responsibility. Defendants often are instructed in court by attorneys and judges prior to accepting a non-conviction disposition that the disposition will not create a "criminal record."[138]   Unfortunately, most judges and attorneys are not acquainted with the world of employer background checks, which involve both conviction and non-conviction dispositions. Relying on the information provided in court, many defendants are later surprised to see non-convictions included in their criminal histories, and outraged when they discover that their right to expunge, which may have existed for years, has been extinguished through a subsequent conviction.

Obviously, judges and attorneys need to provide defendants with a full explanation of the consequences of a non-conviction disposition, and the right to have it expunged. Defense attorneys, as a matter of course, should file expungement petitions in these cases, either at the end of the 3 year statutory waiting period, or shortly after disposition–asking courts to hold the petition in *sub curia* until the statutory period has expired.

Amending the expungement statute to allow the expungement of non-convictions

45

regardless of the subsequent behavior of the defendant, however, is far more efficacious and equitable. The criminal justice system already has non-conviction disposition options that penalize a defendant for subsequent misbehavior: both the "stet" and "probation before judgement" disposition put a defendant at risk of being returned to court and being convicted should s/he violate the terms of the disposition. Defendants who successfully comply with the terms of such dispositions should not be subject to a civil disability for missteps that occur years later and that may have little to do with the prior non-convictions.

Bills seeking to repeal the current limitations on expungement have been introduced in the General Assembly during the last two legislative sessions, but were rejected by the House Judiciary Committee.[139] The legislation should be introduced again and passed.

46

## End Notes

1.  Neal Miller, *Criminal Convictions, "Off Duty Misconduct," And Federal Employment: The Need for Better Definition of the Basis for Disciplinary Action,* 39 American University Law Review 869 (Summer 1990).

2. Gregory v. Litton Sys., Inc., 316 F. Supp. 401 (C.D.Cal. 1970).

3. Md. Education Code Ann. §6-113.

4. COMAR 10.09.54.06 and .07.

5. See Md. Cts. & Jud. Proc. Code Ann. §10-905; Ricketts v. State, 436 A.2d. 906 (1981); Proutt v. State, 311 Md. 364 (1985); Thiess v. Board of Elections 387 F. Supp. 1038, 1041 (1974); Matthews v. State, 68 Md. App. 282 (1986).

6. COMAR 10.07.14.17 & 10.07.14.27.

7. COMAR 10.09.54.06 and .07.

8. COMAR 10.22.02.11.

9. COMAR 12.10.01.17

10. Id.

11. Id.

12. Md. Family Law Code Ann. §5-561.

13. Md. Family Law Code Ann. §5-563 & §5-566.

14. Md.  Family Law Code Ann. §5-619.

15. Md. Health-General Ann. §19-902.

16. Md. Health-General Ann. §19-1909.

17. Md. Health-General Code Ann. §19-1908.

18. Md. Health-General Code. Ann. §19-1910.

19.  Md. Public Utility Companies Code Ann. §10-104.

20. MD. PUBLIC UTILITY COMPANIES CODE ANN. §10-102.

21. Md. Ann. Code Art. 83C, § 2-132.

47

22.Md. Business Occupations and Professions Code Ann. §18-3A-03.

23.Md. Code Ann. Art. 27 § 754A.

24.Md. Ann. Code Art. 38A § 7A.

25.Md. Health Occupations Code Ann. §12-313.

26.Md. Business Regulation Code Ann. §9A-310 .

27.See *Linkus v. Maryland State Bd.*, 114 Md. App. 262 (1997).

28.Md. Business Occupations and Professions Code Ann. §14-317.

29.Md. Ann. Code Art. 41 § 1-502.

30.Stanley Mazaroff, *Maryland Employment Law*, §5.07[1][b] (Lexis Publishing, 2nd Edition, 2001).

31.Compare *Evans v. Morsell,* 300 Md. 133 (1983) with *Cramer v. Housing Opportunities Commission*, 304 Md. 705 (1985).

32. Md. Ann. Code Art. 27, §292(a).

33.*Murray v. Swenson*, 196 Md. 222, 226 (1950).

34. Md. Crim. Pro. §6-220 (d).

35. 15 USCS §1681c (a)(5) (1978).

36. Md. Com. Law §14-1203(a)(5).

37. Public Law 105-347, SECTION 5 [the "Consumer Reporting Employment Clarification Act of 1998"], codified at 15 USCS §1681c (a)(5).

38. Congressional Record, Page H 10219, October 8, 1998; Page S. 11638, October 6, 1998. (Both re S. 2561)

39. Md. Com. Law §14-1203(a).

40. Letter of Kathryn M. Rowe, Assistant Attorney General, to Hon. Samuel I. Rosenberg, November 6, 2001.

41. Id.

42. 15 USCS §1681k and Md. Com. Law §14-210.

43. Id.

44. Id.

45. 15 USCS §1681m(a) and Md. Com. Law §14-1212.

46. 15 USCS §§1681n, 1681o; Md. Com. Law §§14-1213,14-1218.

47. Md. Election Law §3-102. And See AG Opinions of June 20, 1973 and October 2, 1973.

48. Md. Election Law §3-102. See also *State v. Broadwater*, 317 Md. 342 (1989).

49. 24 CFR §982.553(a).

50. NY CLS Correc §752.

51. See *Green v. Mo. Pac. R.R. Co.*, 523 F. 2d 1290 (8th Cir. 1975), *aff'd* 549 F. 2d 1158 (8th Cir. 1977); *Carter v. Gallagher*, 452 F. 2d 315 (8th Cir. 1971); *Dozier v. Chupka*, 395 F. Supp. 836 (S.D. Ohio 1975); *Richardson v. Hotel Corp. of Am.*, 332 F. Supp. 519 (E.D.La. 1971), *aff'd mem.*, 468 F. 2d 951 (5th Cir. 1972); EEOC Decision No. 74-89 (Feb. 12, 1974); EEOC Decision No. 71-2682 (June 28, 1971).

52. U.S. Equal Employment Opportunities Commission, *Policy Statement on the Issue of Conviction Records Under Title VII of the Civil Rights Act of 1964, as amended, 42 USC §2000e* (1982) II EEOC COMPLIANCE MANUAL §604.

53. Michael Meltsner, Marc Caplan, William C. Lane, *An Act to Promote the Rehabilitation of Criminal Offenders in the State of New York*, Syracuse Law Review,Vol. 24:885, 904 (Summer, 1973).

54. Grafer v. NY City Civil Service Commission, 581 N.Y.S. 2d 337 (App. Div. 1992).

55. Soto-Lopez v. NY City Civil Service Commission, 713 F. Supp. 677 (S.D. 1989).

56. In the Matter of City of New York et al. V. City Civil Service Commission et al., 141 Misc. 276; 532 N.Y.S. 626 (1988).

57. NY CLS Correc §753.

58. See Bonacorsa v. Van Lindt, 71 NY2d 605, 528 NYS2d 519, 523 NE2d 806 (1988); Arrocha v. Board of Educ., 93 NY2d 361, 690 NYS2d 503, 712 NE2d 669 (1999); Valley Stream v. Local 342. 89 App Div 2d 1016, 454 NYS 2d (1982, 2nd Dept).

59. Marra v. White Plains, 96 App. Div. 2d 17, 467 NYS2d 865 (1983, 2nd Dept).

60. Telephone interview with Jim Murray, New York State Division of Parole (May 4, 2001). Murray states that roughly 600 actually begin the process each year, but that half drop out. Murray handles all inquiries and requests for Certificates from the Parole Board, and clearly acts as a gatekeeper to the process.

61. NY CLS Correc §754.

62. State of New York Department of Correctional Services, <u>Admissions and Releases</u>, 1998; Department of Justice, Office of Justice Program, <u>Adults on Parole 2000</u>, http://www.ojp.usdoj.gov/bjs/abstract/ppus00.htm.

63. See Job Opportunities Task Force, *Baltimore Area Jobs and Low-Skill Job Seekers: Assessing the Gaps,* March 1999 (p.27).

64. Interview with Bobby Genn, New York State Department of Labor, Special Employment Services (May 8, 2001).

65. Interview with Debbie Mukumal, Legal Action Center, (May 1, 2001). "Wow, is that right?" is a typical employer response according to Mukumal.

66. Interview with John Rakis, Osborne Association (May 4, 2001). South Forty merged with the Osborne Association.

67. Interview with Murray (See n.43). Murray's perspective may be a reason that so few certificates are actually processed at the Division of Parole.

68. *Testimony of the Legal Action Center in Support of Resolution 1521: Legislation to Enact the Second Chance Program, Before the New York City Council*, October 19, 2000, Presented by Anita R. Marton, Senior Attorney.

69. Wis. Stat. §§111.321, 111.325. (1999).

70. Wis. Stat. §111.322(1). (1999).

71. Wis. Stat. §111.335. (1999). Of course, this also applies to licensing agencies, labor organizations, and other persons.

72. Wis. Stat. §111.39(4). (1999).

73. Wis. Stat. §§111.39(5), 227.52-53. (1999).

74. Wis. Stat. §§111.39(4)(c). (1999).

75. Id.

76. See *Gulbrandson v. City of Franklin* [No. ERD-7905259 (LIRC July 2, 1981)], *McVicker v. Milwaukee County Children's Court Center* [No. ERD-8152283 (LIRC June 28, 1983)], *Gumbert v. Ken Loesch Oldsmobile, Inc.*[No. ERD-8206448 (LIRC July 9, 1985)], *and Johnson v. Board of School Directors of Milwaukee* [No. ERD-7805675(LIRC June 28, 1983)].

77.139 Wis. 2d. 805, 407 N.W. 2d 908 (1987).

78.*Farr v. Wisconsin Dept. of Regulation and Licensing* (LIRC, 11/15/99)

79.*Liige v. Schneider Nat'l* (LIRC, 06/10/98).

80.*Jackson v. Direct Supply, Inc.* (LIRC, 07/08/98).

81.*Kort v. Tombstone Pizza* (LIRC, 10/23/96).

82.*Nelson v. The Prudential Ins. Co.* (LIRC, 05/17/96).

83.*Thomas v. DHSS* (Wis. Personnel Comm. 04/30/93).

84.*Goerl v. Appleton Papers* (LIRC, 10/22/92).

85.*Mullikin v. Wal-Mart Stores* (LIRC, 08/27/92).

86.*Halverson v. LIRC* (Ct. App. District III, unpublished decision, 08/09/88).

87.*Employers Ins. of Wassau v. LIRC* (Marathon Co. Cir. Ct., 02/10/88).

88.Milwaukee Journal Sentinel, November 14, 1999, Sunday Final, Pg. 1, *Turner Files Reveal Building Frustration Lack of Work, Close Watch Tug at 'Halloween Killer'.*

89.Milwaukee Journal Sentinel, August 25, 1999, Wednesday Final, Pg. 3, *Proposal Would Allow Schools to Shun Felons.*

90.Milwaukee Journal Sentinel, June 13, 2001, Final Edition, Pg. 1B, *Court Upholds Order to Rehire Ex-MPS Janitor.*

91.See 2001 Assembly Bill 4 (schools) and 2001 Assembly Bill 186 (all employers).

92.Milwaukee Journal Sentinel, August 21, 1999, Pg. 1, *Lawmakers Decry Ruling for MPS to Rehire Felon.*

93.Jeffrey D. Myers, Note, *County of Milwaukee v. LIRC*: Levels of Abstraction and Employment Discrimination Because of Arrest or Conviction Record, 1988 Wisconsin Law Review 891 (September 1988/October 1988).

94. 18 Pa. C.S. §9125 (2000).

51

95. Id.

96. Telephone interview with Sharon Dietrich, Managing Attorney, Community Legal Services, Inc. (Philadelphia) (September 25, 2000).

97. See Act 169, §5 of 1996, then codified at 35 P.S. §10225.503 (1997).

98. Act 13 of 1997 (P.L. 160, No. 13), codified as 35 P.S. §10225.503.

99. *Nixon, Curry, Williams et. al. v. Commonwealth*, No. C.D. 2000, Commonwealth Court of Pennsylvania (August 8, 2000).

100. Id.

101. Mass. Gen.. Laws ch.6, §168 (2001).

102. Mass. Gen. Laws ch. 6, §172; see also *Bynes v. School Comm.* 411 Mass. 264, 265, 581 N.E. 2d 1019, 1020 (1991).

103. Northeastern University School of Law, *Massachusetts CORI-Based Employment Discrimination: Effects and Strategies for Change* (Spring, 2001) (Hereinafter *Northeastern Study*) (On file with author).

104. The Board consists of the State Secretary of Public Safety, the Attorney General, the Chair of the state Sentencing Commission, chief counsel for the Committee for Public Counsel Services, Chair of the Board of Parole, Commissioner of the Dept. of Correction, Commissioner of Probation, Commissioner of the Dept. of Youth Services, the Colonel of the State Police, and representatives of the state sheriffs Association, District Attorneys Association, Chiefs of Police Association, private users of CORI (one of whom shall be a victim of crime), and four persons who have experience in personal privacy issues. Mass. Ann. Laws ch. 6, §168 (2001).

105. *Bynes v. School Comm.* 411 Mass. 268, 581 N.E. 2d 1021 (1991). See also Ferriter, *Language That Limits Employer Liability in Massachusetts,* 21 Western New England Law Review 97 (1999).

106. Boston Globe, July 6, 1990, Editorial Page; Pg. 14. See also *Northeastern Study* at 13.

107. *Northeastern Study* at 15, n.32.

108. Boston Globe, Sept. 2, 1988, Metro/Region; Pg. 15. *Northeastern*, at 15.

109. Boston Globe, July 2, 1992, Metro/Region; Pg. 54.

110. *Northeastern* at 17.

111. Id.at 17-18; Telephone interview with Deborah Harris, Esq. Massachusetts Law Reform Institute, August 10, 2001.

112. Boston Globe, June 17, 2001, Metro/Region; Pg. A1.

113. *Cronin v. O"Leary*      ; Harris interview (8/10/01).

114. Boston Globe, February 23, 2001, Metro/Region Pg. B3; October 7, 1999, Metro/Region, Pg. B1.

115. U.S. Census Bureau, 1997 Economic Census: Summary Statistics for Massachusetts 1997 NAICS Basis

116. U.S. Census Bureau, 1997 Economic Census: Comparative Statistics for Massachusetts 1987 SIC Basis.

117. U.S. Census Bureau, 1997 Economic Census: Comparative Statistics for Maryland 1987 SIC Basis.

118. HRS §§378-2, 378-2.5.

119. HRS §378.4.

120. Electronic Mail from Al Lynde, Administrative Assistant, Hawaii Civil Rights Commission, September 27, 2000.

121. Minn. Stat 364.03.

122. Id.

123. Minn. Stat 364.04.

124. Minn. Stat. 364.06.

125. Minn. Stat. 364.09

126. Wash. Rev. Code §9.96A.020.

127. Wash. Rev. Code §9.94A.230.

128. Id.

129. Colo. Rev. State. §24-72-308.

130. Id.

131.N.J. Rev. Stat. §2A:168A-2.

132. Id.

133. La. Rev. Stat. §37:2950.

134. Mass. Ann. Laws ch. 151B,§4(9).

135. 42 U.S.C.§1681t(b)(1)(E).

136. According to reports from ex-offenders and their advocates, Rite Aid appears to employ broad-based hiring prohibitions against ex-offenders, regardless of the offense. This should be public knowledge for a business that received $7.1 million in state grants, tax credits, and road rights and water line extensions in the late 1990s for a new distribution warehouse.

137. See Dermot Sullivan, *Note: Employee Violence, Negligent Hiring, and Criminal Records Checks: New York's Need to Reevaluate Its Priorities to Promote Public Safety,* 72 St. John's Law Review 581 (Spring, 1998) [which proposes such liability limitations].

138. HPRP has witnessed this firsthand, by observing cases in court and listening to court proceedings that were tape recorded.

139. HB 705 (Delegate Marriott) in the 2000 Regular Session, and HB 542 (Delegates Marriott, Rawlings et.al.) in the 2001 Regular Session.

54

# UNITED STATES DISTRICT COURT
# FORTHE DISTRICT OF COLUMBIA

JOSEPH JOHNSON, JR.                              )

     Plaintiff,                                   )

Vs.                                              ) Civil No. 07-02183 (JR)

U.S. DEPARTMENT OF EDUCATION, et al.,            )

     Defendants.                                  )

## <u>ORDER</u>

Upon consideration of the parties cross motions for summary judgment, the oppositions and replies thereto, and after careful review of the entire record, it is this _____ day of _____, 2008;

ORDERED, that the Defendant's motion is denied; and it is,

FURTHER ORDERED, that the Plaintiff's motion is granted. Summary Judgment is entered on behalf of the Plaintiff; and it is,

FURTHER ORDERED AND ADJUDGED, that (i) the Defendant's regulations imposing conditions that requires a student inform the school of his status prior to enrollment or provide documentation proving the denial for a license due to a criminal record in order to qualify for discharge under Section 1087(c) are unlawful and void because they are not authorized by the statute; (ii) the Defendant is directed to discharge the liability on all of the student and parent loans of Plaintiff in accordance with 20 U.S.C. §1087(c), including reimburse Plaintiff for any amounts collected on the loans,

12

and report to credit agencies or eligible institutions that Plaintiff's loans have been

discharged.

_____
James Robertson
United States District Judge

JOSEPH JOHNSON, JR.
2600 Brinkley Road #1005
Fort Washington, MD   20744

Defendants Served by ECF filing

13